## PATTERSON *v.* KENTUCKY.

1. Where, by the application of the invention or- discovery for which letters-patent have been granted by the United States, tangible property comes into existence, its use is, to the same extent as that of any other species of property, subject, within the several States, to the control which they may respectively impose in the legitimate exercise of their powers over their purely domestic affairs, whether of internal commerce or of police.

2. A party to whom such letters-patent were, in the usual form, issued for "an improved burning oil," whereof he claimed to be the inventor, was convicted in Kentucky for there selling that oil. It had been condemned by the State inspector as "unsafe for illuminating purposes," under a statute requiring such inspection, and imposing a penalty for selling or offering to sell within the State oils or fluids, the product of coal, petroleum, or other bituminous substances, which can be used for such purposes, and which have been so condemned. It was admitted on the trial that the oil could not, by any chemical combination described in the specification annexed to the letters-patent, be made to conform to the standard prescribed by that statute. *Held*, that the enforcement of the statute interfered with no right conferred by the letters-patent.

ERROR to the Court of Appeals of the State of Kentucky. The facts are stated in the opinion of the court.

*Mr. Matt. H. Carpenter* for the plaintiff in error.
*Mr. Albert Pike*, contra.

MR. JUSTICE HARLAN delivered the opinion of the court.

Whether the final judgment of the Court of Appeals of

Kentucky denies to plaintiff in error any right secured to her by the Constitution and laws of the United States, is the sole question presented in this case for our determination.

That court affirmed the judgment of an inferior State court in which, upon indictment and trial, a fine of $250 was imposed upon plaintiff in error for a violation of certain provisions of a Kentucky statute, approved Feb. 21, 1874, regulating the inspection and gauging of oils and fluids, the product of coal, petroleum, or other bituminous substances. The statute provides that such oils and fluids, by whatever name called and wherever manufactured, which may or can be used for illuminating purposes, shall be inspected by an authorized State officer, before being used, sold, or offered for sale. Such as ignite or permanently burn at a temperature of 130° Fahrenheit and upwards are recognized by the statute as standard oils, while those which ignite or permanently burn at a less temperature are condemned as unsafe for illuminating purposes. Inspectors are required to brand casks and barrels with the words " standard oil," or with the words " unsafe for illuminating purposes," as inspection may show to be proper. The statute imposes a penalty upon all who sell or offer for sale, within the State, such oils and fluids as have been condemned, the casks or barrels containing which have been branded with the words indicating such condemnation.

The specific offence charged in the indictment was that the plaintiff in error had sold, within the State, to one Davis an oil known as the Aurora oil, the casks containing which had been previously branded by an authorized inspector with the words " unsafe for illuminating purposes." That particular oil is the same for which, in 1867, letters-patent were granted to Henry C. Dewitt, of whom the plaintiff in error is the assignee, by assignment duly recorded as required by the laws of the United States. Upon the trial of the case it was agreed that the Aurora oil could not, by any chemical combination described in the patent, be made to conform to the standard or test required by the Kentucky statute as a prerequisite to the right, within that State, to sell, or to offer for sale, illuminating oils of the kind designated.

The plaintiff in error, as assignee of the patentee, in asserting the right to sell the Aurora oil in any part of the United States, claims that no State could, consistently with the Federal Constitution and the laws of Congress, prevent or obstruct the exercise of that right, either by express words of prohibition, or by regulations which prescribed tests to which the patented article could not be made to conform.

The Court of Appeals of Kentucky held this construction of the Constitution and the laws of the United States to be inadmissible, and in that opinion we concur.

Congress is given power to promote the progress of science and the useful arts. To that end it may, by all necessary and proper laws, secure to inventors, for limited times, the exclusive right to their inventions. That power has been exerted in the various statutes prescribing the terms and conditions upon which letters-patent may be obtained. It is true that letters-patent, pursuing the words of the statute, do, in terms, grant to the inventor, his heirs and assigns, the exclusive right to make, use, and vend to others his invention or discovery, throughout the United States and the Territories thereof. But, obviously, this right is not granted or secured, without reference to the general powers which the several States of the Union unquestionably possess over their purely domestic affairs, whether of internal commerce or of police. " In the American constitutional system," says Mr. Cooley, " the power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government." Cooley, Const. Lim. 574. While it is confessedly difficult to mark the precise boundaries of that power, or to indicate, by any general rule, the exact limitations which the States must observe in its exercise, the existence of such a power in the States has been uniformly recognized in this court. *Gibbons* v. *Ogden*, 9 Wheat. 1; *License Cases*, 5 How. 504; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Henderson et al.* v. *Mayor of the City of New York et al.*, 92 U. S. 259; *Railroad Company* v. *Husen*, 95 id. 465; *Beer Company* v. *Massachusetts*, *supra*, p. 25. It is embraced in what Mr. Chief Justice Marshall, in *Gibbons* v. *Ogden*, calls that " immense mass of legislation " which can be most advantageously exercised by the States, and

over which the national authorities cannot assume supervision or control. "If the power only extends to a just regulation of rights, with a view to the due protection and enjoyment of all, and does not deprive any one of that which is justly and properly his own, it is obvious that its possession by the State, and its exercise for the regulation of the property and actions of its citizens, cannot well constitute an invasion of national jurisdiction or afford a basis for an appeal to the protection of the national authorities." Cooley, Const. Lim. 574. By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the Constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government. The Kentucky statute under examination manifestly belongs to that class of legislation. It is, in the best sense, a mere police regulation, deemed essential for the protection of the lives and property of citizens. It expresses in the most solemn form the deliberate judgment of the State that burning fluids which ignite or permanently burn at less than a prescribed temperature are unsafe for illuminating purposes. Whether the policy thus pursued by the State is wise or unwise, it is not the province of the national authorities to determine. That belongs to each State, under its own sense of duty, and in view of the provisions of its own Constitution. Its action, in those respects, is beyond the corrective power of this court. That the statute of 1874 is a police regulation within the meaning of the authorities is clear from our decision in *United States* v. *Dewitt*, 9 Wall. 41. By the internal revenue act of March 2, 1867, a penalty was imposed upon any person who should mix for sale naphtha and illuminating oils, or who should knowingly sell or keep for sale, or offer for sale, such mixture, or who should sell or offer for sale oil made from petroleum for illuminating purposes, inflammable at less temperature or fire-test than 110° Fahrenheit. We held that to be simply a police regulation, relating exclusively to the internal trade of the States; that, although emanating from Congress, it could have by its

own force no constitutional operation within State limits, and was without effect, except where the legislative authority of Congress excluded, territorially, all State legislation, as, for example, in the District of Columbia.

The Kentucky statute being, then, an ordinary police regulation for the government of those engaged in the internal commerce of that State, the only remaining question is, whether, under the operation of the Federal Constitution and the laws of Congress, it is without effect in cases where the oil, although condemned by the State as unsafe for illuminating purposes, has been made and prepared for sale in accordance with a discovery for which letter-patents had been granted. We are of opinion that the right conferred upon the patentee and his assigns to use and vend the corporeal thing or article, brought into existence by the application of the patented discovery, must be exercised in subordination to the police regulations which the State established by the statute of 1874. It is not to be supposed that Congress intended to authorize or regulate the sale, within a State, of tangible personal property which that State declares to be unfit and unsafe for use, and by statute has prohibited from being sold or offered for sale within her limits. It was held by Chief Justice Shaw to be a settled principle, "growing out of the nature of well-ordered society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." *Commonwealth* v. *Alger*, 7 Cush. (Mass.) 53. In recognition of this fundamental principle, we have frequently decided that the police power of the States was not surrendered when the Constitution conferred upon Congress the general power to regulate commerce with foreign nations and between the several States. Hence the States may, by police regulations, protect their people against the introduction within their respective limits of infected merchandise. "A bale of goods upon which the duties have or have not been paid, laden with infection, may be seized under health laws, and if it cannot be purged of its poison, may be committed to the flames." *Gilman* v. *Philadelphia, supra.*

So may the States, by like regulations, exclude from their midst not only convicts, paupers, idiots, lunatics, and persons likely to become a public charge, but animals having contagious diseases. *Railroad Company* v. *Husen, supra.* This court has never hesitated, by the most rigid rules of construction, to guard the commercial power of Congress against encroachment in the form or under the guise of State regulation, established for the purpose and with the effect of destroying or impairing rights secured by the Constitution. It has, nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding State police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property, which each State owes to her citizens. These considerations, gathered from the former decisions of this court, would seem to justify the conclusion that the right which the patentee or his assignee possesses in the property created by the application of a patented discovery must be enjoyed subject to the complete and salutary power with which the States have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few. The right of property in the physical substance, which is the fruit of the discovery, is altogether distinct from the right in the discovery itself, just as the property in the instruments or plate by which copies of a map are multiplied is distinct from the copyright of the map itself. *Stephens* v. *Cady,* 14 How. 528; *Stevens* v. *Gladding et al.,* 17 id. 447. The right to sell the Aurora oil was not derived from the letters-patent, but it existed and could have been exercised before they were issued, unless it was prohibited by valid local legislation. All which they primarily secure is the exclusive right in the discovery. That is an incorporeal right, or, in the language of Lord Mansfield in *Miller* v. *Taylor* (4 Burr. 2303), "a property in notion," having "no corporeal tangible substance." Its enjoyment may be secured and protected by national authority against all interference; but the use of the tangible property which comes into existence by the application of the discovery is not beyond the control of State legisla-

tion, simply because the patentee acquires a monopoly in his discovery.

An instructive case upon the precise point under consideration is *Jordan* v. *The Overseers of Dayton*, 4 Ohio, 295. Jordan was sued in debt, to recover certain penalties for practising medicine in violation of an Ohio statute regulating the practice of physic and surgery. His defence rested, in part, upon the ground that the medicine administered by him was that for which letters-patent had issued to his assignor, granting to the latter the exclusive right of making, constructing, using, and vending to others to be used, the medicine in question, which was described in the letters-patent as a new and useful improvement, and as being a mode of preparing, mixing, compounding, administering, and using that medicine. The contention of Jordan was that the State government could not restrict or control the beneficial or lucrative use of the invention, and that, as assignee of the patentee, he was entitled to administer the patented medicine without obtaining a license to practise physic or surgery as required by the State statute. The Supreme Court of Ohio said: " This leads us to consider the nature and extent of such rights as accrue from letters-patent for useful discoveries. Although the inventor had at all times the right to enjoy the fruits of his own ingenuity, in every lawful form of which its use was susceptible, yet, before the enactment of the statute, he had not the power of preventing others from participating in that enjoyment to the same extent with himself; so that, however the world might derive benefit from his labors, no profit ensued to himself. The ingenious man was therefore led either to abandon pursuits of this nature, or to conceal his results from the world. The end of the statute was to encourage useful inventions, and to hold forth, as inducements to the inventor, the exclusive use of his inventions for a limited period. The sole operation of the statute is to enable him to prevent others from using the products of his labors except with his consent. But his own right of using is not enlarged or affected. There remains in him, as in every other citizen, the power to manage his property, or give direction to his labors, at his pleasure, subject only to the paramount claims of society, which requires that his enjoyment may be

modified by the exigencies of the community to which he belongs, and regulated by laws which render it subservient to the general welfare, if held subject to State control.   If the State should pass a law for the purpose of destroying a right created by the Constitution, this court will do its duty ; but an attempt by the legislature, in good faith, to regulate the conduct of a portion of its citizens, in a matter strictly pertaining to its internal economy, we cannot but regard as a legitimate exercise. of power, although such law may sometimes indirectly affect the enjoyment of rights flowing from the Federal government." Some light is thrown upon the question by *Vanini et al.* v. *Paine et al.*, 1 Harr. (Del.) 65.   In that case it appears that Yates and McIntyre were assignees of Vanini, the inventor and patentee of a mode of drawing lotteries, and making schemes for lotteries on the combination and permutation principle.   Other brokers issued a scheme for drawing a lottery under a certain act for the benefit of a school, adopting the plan of Vanini's patent.   Yates & McIntyre filed their bill for injunction upon the ground, partly, that the defendants were proceeding in violation of the patent-rights secured to Vanini. The Court of Errors and Appeals of Delaware said: " At the times Yates & McIntyre made contracts for the lottery privileges set forth in the bill, we had, in force, an act of assembly prohibiting lotteries, the preamble of which declares that they are pernicious and destructive to frugality and industry, and introductive of idleness and immorality, and against the common good and general welfare.   It therefore cannot be admitted that the plaintiffs have a right to use an invention for drawing lotteries in this State, merely because they have a patent for it under the United States.   A person might with as much propriety claim a right to commit murder with an instrument, because he held a patent for it as a new and useful invention."

In *Livingston* v. *Van Ingen* (9 Johns. (N. Y.) 507), Chancellor Kent said that " the national power will be fully satisfied if the property created by patent be, for the given time, enjoyed and used exclusively, *so far* as, under the laws of the several States, the property shall be deemed for toleration.   There is no need of giving this power any broader construction in order to

attain the end for which it was granted, which was to reward the beneficent efforts of genius, and to encourage the useful arts." That case, so far as it related to the validity, under the commercial clause of the Constitution, of certain statutes of. New York, is not now recognized as authority. It is, perhaps, also true that the language just quoted was not absolutely necessary to the decision of that case. But as an expression of opinion by an eminent jurist as to the nature and extent of the rights secured by the Federal Constitution to inventors, it is entitled to great weight.

Without further elaboration, we deem it only necessary to say that the Kentucky statute does not, in our judgment, contravene the provisions of the Federal Constitution, or of any statute passed in pursuance thereof. Its enforcement causes no necessary conflict with national authority, and interferes with no right secured by Federal legislation, to the patentee or his assigns.

We perceive no error in the judgment, and it is

*Affirmed.*

MR. JUSTICE HUNT did not sit in this case, nor take any part in deciding it.