DALLAS, Circuit Judge.
This case has been tried by the court, without the intervention of a jury, under section 649 of the Revised Statutes [U. S. Comp. St. 1901, p. 525].
Findings of the Court upon the Facts.
The plaintiff adduced in evidence a promissory note dated December 12, 1901, for $20,000, payable June 10, 1902, at 817 Drexel building, Philadelphia, signed, “American Alkali Company, A. K. Brown, President, Clayton E. Platt, Treasurer.” This note was payable to the order of the American Alkali Company, and was indorsed by the same officers of that company who had signed it. It was protested upon June 10, 1902. The plaintiff also adduced in evidence a like note for $30,000, bearing the same date and payable at the same time as the note above mentioned, and in like manner executed, indorsed, and protested. By this proof the plaintiff established a prima facie right to recover the amount of said notes, with interest and costs of protests. This is not questioned; and, as respects the defense, it is said in the defendant’s brief that “the plaintiff’s requests for findings of fact cover the material facts in the case, and defendant concedes them all,” with two “-qualifications,” which, as they do not challenge the correctness of the statements of fact to which they relate, but merely present the claims of the defendants as to their effect, need not be at this point considered. I accordingly find the following facts :
(1) Tbe American Alkali Company is a corporation organized under tbe laws of tbe state of New Jersey, and has its principal office in tbe city of Camden, N. J. It also maintains an office in the Drexel building, in tbe city of Philadelphia.
(2) By agreement in writing dated May 6, 1899, tbe American Alkali Company agreed to purchase from the Commercial Development Corporation, Limited, organized under tbe laws of Great Britain, letters patent of the United States Nos. 608,300 and 501,783, dated respectively August 2, 1898, and July 18, 1893; and also letters patent of Canada No. 61,368, and to pay in consideration for tbe assignment therefor 479,960 shares of the common stock of the American Alkali Company, full paid and nonassessable, and $1,000,000, payable as follows: One accepted bill, at not to exceed ISO days, for $100,000; a note or notes, made by the company to its own order and indorsed by the company, and at not later than June. 1st, and for $500,000; and four accepted.drafts, at not to exceed 12 months, for $100,000 each.
(3) Among the accepted drafts thus given was one for $100,000, dated May 18, 1899, payable 12 months after date. When this matured, $50,000 in cash was paid on account and two new drafts were given, one for $32,000 and another for $20,000. These matured in May, 1901, and were renewed by two drafts of like amount, which were the drafts hypothecated by the Commer *1002 cial Development Company to the plaintiff on November 5, 1901. These were not paid at maturity, but were renewed by the drafts in suit, which bear date December 12, 1901, and matured June 10, 1902.
(4) The contract of May 6, 1899, was executed at the office of the American Alkali Company in Philadelphia, and the drafts and notes were there executed. In the negotiations the Commercial Development Corporation, Limited, was represented by A. R. Harvey, its attorney in fact, and a managing director specially authorized to act in the premises. Authority for the execution of the contract and the issue of the drafts referred to therein was given at a meeting of the stockholders of the American Alkali Company held May 5, 1899, at its office in Camden, N. J.
(5) About the 1st of November, 1901, Thomas Pegram, residing in Liverpool, England, was requested to make a loan to the Commercial Development Corporation, Limited, of £10,000. The application was made through a solicitor, Mr. Alderman. Fred Smith, senior partner of the firm of Grace, Smith & Hood, and a magistrate of Liverpool. The statement was made that the loan of £10,000 was but for a short time, and that as collateral Mr. Pegram should receive the rights of the Commercial Development Company under a contract with a firm named Perrins, Limited, any funds coming to the Commercial Development Company from the flotation of certain Spanish tin mines, and the American Alkali bills for $52,000. After a negotiation lasting a few days, on November 5, 1901, the plaintiff loaned the Commercial Development Corporation, Limited, £10,000, giving them his check for that amount on Lloyd’s Bank, Limited, of Liverpool, which check was forthwith presented and paid in due course. To secure the loan the Commercial Development Company, Limited, executed a writing under date of November 5, 1901, reciting that in consideration of the sum of £10,000 paid them they hypothecated in favor of Pegram (1) the sum of $52,000, payable in respect of the two bills of exchange dated the 15th April, 1901, for $32,000 and $20,-000, respectively, payable to the order of the American Alkali Company and indorsed by it, and (2) the moneys payable “to us in respect of the flotation of the Spanish Tin Mining Company,” and undertaking to pay the said sum of $52,000 and the said moneys payable in respect of the flotation of the said Spanish Tin Mining Company immediately upon receipt of the same to the extent of £10,500. At the date of this transaction -the Alkali bills of exchange above mentioned were in the possession of Messrs. Chapman & Co., bankers, of New York, for the account of the Commercial Development Company. • On December 10, 1901, $2,000 was paid on account thereof by the American Alkali Company to Messrs. Chapman & Co., and the notes in suit were given for the balance of $50,000. Mr. Pegram received no part of the $2,000 which was paid by Chapman & Co. to the Commercial Development Company. Subsequently, upon hearing of these facts, the, plaintiff took the notes in suit out of the hands of Chapman & Co., and placed them in the hands of the Canadian Bank of Commerce, to be held for his own account. In making the loan to the Commercial Development Company, the plaintiff had no notice or information that the consideration for the American Alkali bills was the assignment of the letters patent above mentioned. The loan was made in good faith, and with nothing to impair the plaintiff’s rights as a purchaser for value without notice.
(6) Under date of December 5, 1901, A. R. Harvey executed a writing in favor of the plaintiff, in words following: “In consideration of your not requiring payment forthwith of the sum of £10,500 due to you from the Com-mercial Development Corporation, Limited, I hereby guarantee the payment by them to you of the said sum of £10,500 on the fifth day of January, 1902.”-On January 9, 1902, a further writing, as follows: “In consideration of your not requiring payment forthwith of the sum of £10,500 due from the Commercial Development Corporation, Limited, to you I hereby consent to your extending the time for payment of the said sum and to the corporation giving you further security for the same.” And on April 29, 1902, a further writing, as follows: “In consideration of your extending the time for payment by the Commercial Development Corporation, Limited, of the sum of £11,000 to the 7th proximo I hereby guarantee the payment by them to you of the said sum of £11,000 on the 7th proximo but this guarantee is not to. *1003 be enforced before the 12th day of June next.” And on April 30, 1902, Ruth L. Harvey, the wife of A. R. Harvey, executed writings in words following: “In consideration of your extending the time for payment by the Commercial Development Corporation Limited of the sum of £11,000 to the 7th proximo I hereby charge all my interest in ‘Ramleh’ (exclusive of the charge of £4,500 already upon it) and also the furniture and fixtures upon which there is no charge I also undertake that no charge will be made upon ‘Ramleh’ or upon the said furniture and fixtures and that I will not remove or disturb anything at Ramleh between the present date and the 12th day of June next.” “In consideration of your extending the time for payment by the Commercial Development Corporation Limited of the sum of £11,000 to the 7th May 1902 I hereby guarantee the payment by them to you of the said sum of £10,750 on the 7th May 1902 but this guarantee is not to be enforced before the 12th day of June 1902.”
(7) In June, 1902, the Commercial Development .Company was placed in the hands of a receiver and liquidator, and out of that receivership the plaintiff realized £90 on account of the indebtedness. As against the amount thus realized he paid out, in sundry expenses connected with the receivership and keeping the corporation in life, £400. In September, 1902, the plaintiff received the check of Mrs. Ruth L. Harvey for £6,000 on account of her guaranty. In part, at least, this represented the proceeds of the sale of certain Chloride shares which the plaintiff had obtained from W. W. Gibbs on account of an obligation of W. W. Gibbs to A. R. Harvey which had come into the plaintiff’s possession in the course of the dealings. To what extent this check for £6,000 in fact represents moneys of Ruth L. Harvey, and to what extent moneys of A. R. Harvey, the plaintiff was unable to state Other than the moneys herein stated, the plaintiff has received nothing on account of the loan made by him to the Commercial Development Company on November 5, 1901, either by way of payment or in realization of anj of the collaterals.
(8) The plaintiff estimates his expenses in coming to America for the enforcement of his claim at $1,500.
Opinion.
The defendant admits that the plaintiff is entitled to recover the balance now due to him by the Commercial Development Company, Limited, on account of his loan of iio,ooo to that company made November 5, igoi; but insists that the plaintiff’s claim to recover the full amount of the notes sued on cannot be sustained, because neither they nor any of the preceding drafts of which they constitute renewals had the words “given for a patent right” written or printed on their face, although the original draft of the series was in fact part of the consideration for a purchase of patent rights. This insistence rests upon a statute o.f Pennsylvania, as follows:
“An act to regulate the execution and transfer of notes given for patent rights.
“Section 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, that whenever any promissory note or other negotiable instrument shall be given, consideration for which shall consist in whole or in part of the right to make, use, or vend any patent invention or inventions, claimed to he patented, the words, ‘given for a patent right,’ shall be prominently and legibly written or printed on the face of such note or instrument, above the signature thereto; and such note or instrument, in the hands of any purchaser or holder shall be subject to the same defenses as in the hands of the original owner or holder.
“Sec. 2. If any person shall take, sell, or transfer any promissory note or other negotiable instrument, not having the words ‘given for a patent right,’ written or printed legibly and prominently on the face of such note or instrument above the signature thereto, knowing the consideration of such note or instrument to consist in whole or in part of the right to make, use, *1004 •or vend any patent invention or inventions claimed to be patented, every sucb person or persons shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not exceeding $500, or imprisoned in the county jail not exceeding sixty days, or both, in the discretion of the court.
“Sec. 3. All acts or parts of acts inconsistent herewith are hereby repealed.” P. L. 1872, pp. 60, 61.
The plaintiff contends that this act is invalid under the clause of the Constitution of Pennsylvania (article 3, § 3) which directs that “no bill shall be passed containing more than one subject, which shall be clearly expressed in its title,” because, though “notes” only arc specified in its title, “other negotiable instruments” are included in the body of the act, and its second section provides that its violation shall constitute a misdemeanor, punishable by fine or imprisonment, or both. I have not been convinced that this contention should be accepted. I think that, unless it clearly appear that a statute of a state contravenes its fundamental law, a court of the United States should not, upon that ground, impugn its validity; and this is especially true as respects the statute now in question, for, though it has been in existence for more than 30 years, no Pennsylvania tribunal has ever supposed that it infringed the Constitution of that state, while in Shires v. Com., 120 Pa. 373, 14 Atl. 251, it was declared that it did not. It is true that in that case the point does not appear to have been discussed, but,, in. my opinion, what was there said accords with the judgments of the same court in other cases in which the meaning and effect of this constitutional provision were fully considered. Com. v. Green, 58 Pa. 226; Yeager v. Weaver, 64 Pa. 425; Dorsey’s App., 72 Pa. 192; Allegheny Co. Home’s Case, 77 Pa. 77; In re Road in Borough of Phœnixville, 109 Pa. 44; Rogers v. Imp. Co., 109 Pa. 109, 1 Atl. 344; Philadelphia v. Market Co., 161 Pa. 522, 29 Atl. 286; Payne v. School Dist., 168 Pa. 386, 31 Atl. 1072; Dewhurst v. Allegheny, 95 Pa. 437; Wynkoop v. Cooch, 89 Pa. 450. And see, also, O’Leary v. Cook, 28 Ill. 534; Missouri v. Matthews, 44 Mo. 523; Williams v. State, 48 Ind. 306; Continental Imp. Co. v. Phelps, 47 Mich. 299, 11 N. W. 167.
Plaintiff’s counsel has submitted the proposition that “the act of April 12, 1872, entitled ‘An act to regulate the execution and transfer of notes given for patent rights,’ is unconstitutional, because it is in derogation of the rights of holders of letters patent issued by the United States to freely sell the same and take payment therefor in negotiable paper, and is an unjust and unauthorized discrimination against them, imposing a restriction upon them not imposed upon vendors of other property.” The decisions of the state courts are not harmonious upon the subject of this proposition, but those of the federal courts seem clearly to support it. In Woollen v. Banker, 2 Flip. 33, Fed. Cas. No. 18,030, Mr. Justice Swayne, at circuit, held a similar statute of the state of Ohio to be unconstitutional, and that decision cannot be said to have been overruled in Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115. Although Mr. Justice Swayne appears to have concurred in the judgment in the latter case, no reference was there made to his ruling of the immediately preceding year in Woollen v. Banker, and in fact the two cases are not conflict *1005 ing. Patterson v. Kentucky concerned only “the right of property in the physical substance, which is the fruit of the discovery,” and it was with respect to this “physical substance” that it was held that enforcement of the state statute interfered with no right conferred by the letters patent, and this upon the ground that “it is not to-be supposed that Congress intended to authorize or regulate the sale, within a state, of tangible personal property which that state declares-to be uríñt and unsafe for use.” The significance of the distinction here indicated is apparent. A patent secures to the patentee the right to debar others from making the thing patented, but it does not confer upon him the right to make it. That he could do (though not exclusively) without a patent. Consequently, his right of property in the patented article, when made, is not founded on government grant, and may as legitimately be subjected to state legislation as any other tangible property. But the monopoly which a patent does-grant is a property right created under the Constitution and laws-of the United States, and by those laws made assignable; and therefore a state law which prescribes that negotiable instruments, in the ordinary form, shall not be given or accepted for an assignment of the patent itself, is as plaihly obstructive of the exercise of a right vested by federal law as would be the inhibition of payment in the current funds upon the sale of a patent for cash.
The limited scope of the judgment in Patterson v. Kentucky was pointed out by the Circuit Court for the District of Indiana in the case of Castle v. Hutchinson (C. C.) 25 Fed. 394, in which a state statute like that now in question was held to be clearly unconstitutional; and, in Reeves v. Corning (C. C.) 51 Fed. 787, while the particular act there involved was upheld, it was said that the decision in Castle v. Hutchinson “may well be supported on the ground of an unjust and unauthorized discrimination. It singles out notes given for patent rights from the common mass of such property, and requires them, to be valid, to show on their face the nature of their consideration. Such discrimination would seem to render the second section of the statute unconstitutional. If the section had required all notes to exhibit on their face the consideration for which they were given, a very different question would have been presented. In my opinion the case of Castle v. Hutchinson is correctly decided; but it by no means is decisive of the question under consideration.” I think that in view of these cases this court should decline to give effect to the Pennsylvania act of April 12, 1872, until its validity shall have been established by a tribunal whose adjudications are authoritative, and accordingly the defense founded upon that act is overruled.
It results from what has been said that the plaintiff is entitled to judgment for the full amount of the notes sued on, with interest thereon at the rate of 6 per cent, per annum, subject to any deductions which, under the evidence, independently of the Pennsylvania statute, should be allowed. But what such deductions, if any, should be, I am not now prepared to decide, and therefore the entry of judgment will be postponed until Thursday, May 28, 1903, at 10 o’clock a. m., when counsel will be further heard upon that subject.