GAJARSA, Circuit Judge,
concurring in the denial of the petition for rehearing en banc.
I concur in the court’s denial of rehearing en banc in this case. There is no need for en banc consideration as the decision is not inconsistent with any prior decisions of the United States Supreme Court or this Circuit. The panel decision reached the correct result on the proper legal basis. I *1345 write briefly to respond to the dissent to the denial of the rehearing en banc.
The dissent acknowledges that the panel was correct to hold that the District of Columbia’s Prescription Drug Excessive Pricing Act of 2005 (the “D.C. Act”) is preempted by the federal patent laws. As it notes, the D.C. Act impermissibly seeks to “establish patent policy” by requiring “the D.C. courts to determine what price is necessary to spur innovation.” Dissent, slip op. at 1349. But the dissent, nevertheless, faults the panel for deciding the issue on “conflict preemption” grounds rather than “field preemption” grounds. The dissent is grounded in sophistry. As the Supreme Court has cautioned, these categories are not “rigidly distinct.” English v. General Elec. Co., 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); see also id. (“Indeed, field pre-emption may be understood as a species of conflict pre-emption.... ”). That the D.C. Act could also be considered preempted by “field preemption” because it impermissi-bly establishes new patent policy, only strengthens the panel’s determination that there is a direct conflict between the D.C. Act and the objects and purposes of the federal patent laws.
The dissent reaches the opposite conclusion by ignoring, for the purposes of its conflict analysis, the D.C. Act’s statutory language and its clear invasion of the patent policy field. Instead, the dissent considers only the Act’s alleged purpose of preventing price discrimination. See, e.g., dissent, slip. op. at 1349 (“Despite the poor drafting of the D.C. Act, which inadvertently invades the field of patent policy, the main thrust of the D.C. Act is designed to prevent price discrimination.... To the extent that the D.C. Act is designed to prohibit price discrimination, I see no conflict with federal policy.”). This bifurcated approach is improper. Regardless of whether D.C.’s interference with patent policy was “inadvertent! ]” or purposeful, we cannot change the language of the statute, but must instead base our preemption analysis on the entire statute as written. Moreover, by focusing only on “price discrimination,” the dissent distorts the holding of the panel, which relied on a consideration of the D.C. Act as a cohesive whole, and which was based in significant part on the panel’s conclusion that the D.C. Act was a direct attempt “to change federal patent policy” within the District of Columbia. Biotechnology Indus. Org. v. District of Columbia, 496 F.3d 1362, 1374 (Fed.Cir.2007).
As the dissent correctly points out, the heightened presumption of validity for state statutes in fields of traditional state regulation can only be overcome by a showing that “the clear and manifest purpose of Congress” is to preempt the state law. N.Y. State Conference of Blue Cross & Blue Shield Plans, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). But finding a clear and manifest purpose does not require an express statement of preemption. Rather preemption is warranted when the challenged state law clearly “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). And the Supreme Court has cautioned that “[w]hat is a sufficient obstacle” is to be determined not only by the express language of the federal statutory enactments, but also by “examining the federal statute as a whole and identifying its purpose and intended effects.” IcL; see also id. (“[T]he entire scheme of the statute must of course be considered and that which needs must be implied is of no less force that that which is expressed.”). Here, the direct conflict between the D.C. Act and the objects and *1346 purposes of the federal laws regarding pharmaceutical patents makes clear Congress’ intention to preempt the D.C. law.
It is, of course, well-established that the patent laws, including the Drug Price Competition and Patent Term Restoration Act of’ 1984 (the “Hatch-Waxman Act”), Pub.L. No. 98-417, 98 Stat. 1585 (codified as amended at 35 U.S.C. § 156), do not “create any affirmative right to make, use, or sell anything.” Leatherman Tool Group v. Cooper Indus., 131 F.3d 1011, 1015 (Fed.Cir.1997). But the right that the patent laws do confer upon patent holders — the right to “exclude others from making, using, or selling a claimed invention for a limited period of time,” id. — is not granted in a vacuum or for its own sake. Rather, as the Constitution itself establishes, the purpose of granting the patentee the right to exclude is “to promote the Progress of Science and useful Arts,” U.S. Const, art I, § 8 cl. 8. And the primary mechanism by which the right to exclude promotes such innovation is by providing the patentee with the opportunity to obtain greater profits than it could have obtained without such a right to exclude. The Hatch-Waxman Act which extended the patent term for pharmaceutical products to account for the costs and delays of the FDA approval process, and its legislative history, make this link especially clear for patented drugs. As the House Committee on Energy and Commerce Report explained:
Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities.
H.R.Rep. No. 98-857, at 15 (1984), U.S.Code Cong. & Admin.News 1984, pp. 2647, 2650; see also 130 Cong. Rec. 24,427 (1984) (statement of Representative Wax-man) (“A patent is a monopoly, and when anyone holds a monopoly that person has the ability or that company has the ability to charge the highest price because there is no one else in competition, and as a matter of public policy we, under the patent law, give that protection to the person who has put money into research and development for an innovative and new product. But at some point public policy calls for the free market system competition which will bring about the result of a lower price for the consumer. That is the purpose of the legislation.”); 130 Cong. Rec. 15846 (statement of Senator Hatch) (“[T]he Drug Price Competition and Patent Term Restoration Act of 1984 ... add[s] stimulus for research on new drugs* and medical devises ... through an extension of patent life to help recover the costs of obtaining FDA approval.”). Congress’ clear purpose to spur innovation by providing a right to exclude can, thus, be obstructed not only by directly preventing an inventor from excluding others, but also by systematically preventing a patentee from reaping the increased profits that would otherwise come from its exclusionary rights.[1]
*1347 Moreover, while there is particularly acute tension in the pharmaceutical context between promoting innovation by increasing the profit reward of patents and the public interest in affordable drugs, it was precisely the balance between these two interests that Congress intended to carefully calibrate when it passed the Hatch-Waxman Act, which not only extended the patent term for pharmaceutical products but also simplified the process of approval for generic products. 98 Stat. 1585. The legislative history of the Hatch-Waxman Act demonstrates that the Act’s readjustment of the scope of the patent right for pharmaceutical products represented the culmination of a “long ... effort to combine and balance these two objectives” of innovation and cost. 130 Cong. Rec. 23058 (statement of Representative Madigan); see also, e.g., 130 Cong. Rec. 23058-59 (statement of Representative Synar) (“This bill accomplishes two important goals: It provides incentives for research on new drugs by restoring a portion of the patent life that is lost during the FDA approval processes; and [i]t increases price competition in the drug marketplace by simplifying the approval process for generic drugs. Together, these two will bring about cheaper drugs today and better drugs tomorrow ... This bill is an important compromise that improves research and development and increases price competition in the drug marketplace.”); id. at 23058 (statement of Representative Madigan) (“Under the provision of this legislation, patent protection can be extended up to 5 years, as long as the extension when added to the patent time remaining, does not exceed 14 years. We must provide this extension to guarantee the continued commitment of resources for the development of innovative drugs to address the changing health needs of our citizens. At the same time, I am concerned with the containment of health care costs. [The bill] will allow the marketing of generic counterparts ... following the expiration of the original patent term ... The contribution of medications to overall cost of health care can be reduced drastically if these generic equivalents are brought to the marketplace in a timely fashion.”).
The D.C. Act is not simply about preventing “price discrimination,” but directly targets and undermines this careful balance between innovation and drug costs. The D.C. Act’s prohibition on “excessive prices” for patented drugs (and patented drugs only), is purposefully aimed at adjusting the scope and reward of the federal patent right. It would replace Congress’s deliberate balance with (a) the different balance reached by other foreign governments (such as Australia, Germany, or the United Kingdom), which although providing exclusivity, temper the benefits of that right with various forms of government price control, and (b) jury determinations of how pharmaceutical companies should be compensated for their innovation. See D.C.Code §§ 28-4552, -4554. In doing so, the D.C. Act clearly “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” Crosby, 530 U.S. at 373, 120 S.Ct. 2288. And in light of this conflict, the panel correctly determined that the D.C. Act was preempted. See id.; see also Bonito Boats v. Thunder Craft Boats, 489 U.S. 141, 152, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (“Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess.”).
The dissent alludes to the price discrimination impact of the D.C. Act not being in conflict with federal patent law. This is an erroneous syllogism, since the issue before the panel was not premised on whether D.C. has the authority to impose price *1348 discrimination restrictions in general; the issue presented was whether or not the specific D.C. Act was preempted by federal patent drug statutes, e.g., 35 U.S.C. §§ 154-57. The panel correctly determined that it was.
Similarly, I note that the dissent overstates the breath of the panel opinion to the extent that it suggests that the opinion would require the preemption of “any state law regulating the prices of patented pharmaceutical products.” See dissent, slip, op., at 1348. The panel opinion’s analysis rests, as all preemption analysis must, on the specifics of the D.C. statute, considered as a whole. See, e.g., Biotechnology Indus. Org., 496 F.3d at 1374 (“The fact that the Act is targeted at the patent right is apparent on its face. It applies only to patented drugs. The District has thus seen fit to change federal patent policy within its borders.”). Whether future efforts of states to regulate drug prices, which for example did not only target patent drugs or did not as significantly or directly undermine the balance of the federal patent right, would also be preempted is a question that remains for another day.
Thus, for the foregoing reasons and those stated in the panel decision, this Court correctly declined to consider this case en banc.

. This does not mean that any state regulation that affects a patentee’s profits so undermines the goals of the patent system as to be preempted. It is well established that states can generally regulate patented products as part of their general exercise of police powers without preemption, even if this regulation incidentally affects the profits a patentee gains from its patent. See, e.g., Patterson v. Kentucky, 97 U.S. 501, 24 L.Ed. 1115 (1878). But that states have broad leeway to regulate patented products does not mean that they have unlimited ability to do so in situations in which the regulation significantly and directly impedes Congress's purpose in providing the federal patent right.