2008 OK 10

**Shatona BITTLE, individually, Plaintiff/Appellant,**

v.

**Valentine BAHE and Val Tsosie, Defendants,**

**The Absentee Shawnee Tribe of Oklahoma and Thunderbird Entertainment Center, Inc., Defendants/Appellees.**

No. 103,716.

Supreme Court of Oklahoma.

Feb. 5, 2008.

Rehearing Denied Sept. 11, 2008.

Gary B. Homsey, Jeffrey M. Cooper, Kevin E. Hill, Homsey, Cooper, Hill & Associates, Oklahoma City, OK, for appellant.

Robert T. Goolsby, Jeremy Z. Carter, Jennifer A. Bruner, Goolsby, Olson & Proctor, Oklahoma City, OK, for appellees.

TAYLOR, J.

¶ 1 This is an appeal from a dismissal of plaintiff's action alleging dram shop liability against an Indian tribe and its casino. The district court ruled that the doctrine of tribal sovereign immunity prevents the state court from exercising jurisdiction over this private tort action against the Indian tribe. Based upon the evidentiary material in the appellate record, we find the Indian tribe and its casino have not established that they are shielded by the doctrine of tribal sovereign immunity from the exercise of state court jurisdiction in this case.

### I. The Proceedings Below

¶ 2 Shatona Bittle, plaintiff/appellant (plaintiff), filed an action in state district

court to recover damages for personal injury she suffered in an automobile collision. The amended petition named as defendants Valentine Bahe, an individual; Val Tsosie, an individual; The Absentee Shawnee Tribe of Oklahoma (Tribe); and Thunderbird Entertainment Center, Inc.

¶3 Plaintiff alleged that at 7:15 a.m. on April 30, 2004, she was driving westbound on Highway 9 when a vehicle driven by Bahe crossed the center line and collided head-on into plaintiff's vehicle. Bahe died at the scene of the collision, and plaintiff suffered multiple injuries. Plaintiff alleged that Tsosie owned the vehicle driven by Bahe, that Tsosie and Bahe had been at the Tribe's casino prior to the collision, that Bahe was intoxicated and served excessive alcoholic beverages at the casino, and that Tsosie was noticeably intoxicated at the scene of the collision. Plaintiff further alleged that the Tribe and the casino have dram shop liability for her personal injury damages.

¶4 It is undisputed that the Tribe is a federally recognized Indian tribe.[1] The Tribe asserted that Thunderbird Entertainment Center, Inc., a corporate economic enterprise created by the Tribe under its ordinances,[2] owns and operates a casino. It is undisputed that the State of Oklahoma issued a mixed beverage license in the name of Thunderbird Entertainment Center, Inc. (Thunderbird casino) to serve liquor by the drink at the casino. The Tribe and Thunderbird casino appeared specially and jointly moved the district court to quash the summons and dismiss them as parties defendant on the basis of tribal sovereign immunity from suit in state court. Plaintiff responded that tribal sovereign immunity does not extend to the area of liquor regulation, but if it does, the Tribe waived its immunity.

¶5 The district court found that neither the Tribe's ordinance nor Thunderbird casino's application for a state mixed beverage license clearly waives tribal immunity. The court concluded that neither the Oklahoma statutes nor the common law allows a private person to enforce violations of 37 O.S.2001, § 537 against the Tribe or Thunderbird casi-

---

1. In its motion to quash the summons, the Tribe asserted it was incorporated under the laws of the State of Oklahoma in 1973 and that corporation was dissolved in 1974. The Tribe did not produce evidence showing its present organization. On remand, the Tribe will have an opportunity to prove its organization.

   We note that the organization of Oklahoma Indian tribes is governed by the Oklahoma Indian Welfare Act, 25 U.S.C. §§ 501–510, originally enacted in 1936. Section 503 authorizes the Secretary of the Interior to issue a charter to a recognized tribe or band of Indians residing in Oklahoma conveying **in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma,** the right to participate in the revolving credit fund and to enjoy any other rights and privileges secured to an organized Indian tribe under the 1934 Indian Reorganization Act, 25 U.S.C. § 461 *et seq.* Section 504 authorizes ten or more Indians residing in close proximity to form a cooperative association for the purpose of credit administration, production, marketing, consumers' protection or land management, and **those matters not covered by the federal act, regulations or charters, would be governed by the laws of Oklahoma.** Section 505 provides that the cooperative association **could sue or be sued in any court, state or federal, in Oklahoma,** having jurisdiction of the cause of action.

2. The Tribe does not advise us of the federal authority, such as the Indian Self-Determination Act, 25 U.S.C. §§ 450 *et seq.,* the Indian Financ-

ing Act, 25 U.S.C. §§ 1452, *et seq.,* or some other federal statute, under which it created Thunderbird Entertainment Center, Inc., if any. The Tribe's ordinances under which it created the corporation are not in the appellate record. The by-laws of tribal corporations often include a "sue and be sued" clause. *See Klammer v. Lower Sioux Convenience Store,* 535 N.W.2d 379, 383 (Minn.App.1995). The Tribe's ordinances posted on the internet at http://www.ntjrc.org/ccfo lder/absentee_shawnee_tribalcodemenu.htm, which are not in this record, provide that the tribal corporations may sue and be sued.

The appellate record does contain a report by an Alcoholic Beverage Law Enforcement agent indicating that Thunderbird Entertainment Center, Inc. is nothing more than a business name under which the Tribe operates the casino. The agent reported that Thunderbird casino's operations manager advised that the corporation does not exist, never existed, and is a fraud, and that the Tribe desired to have a mixed beverage license issued in the name of the Tribe. The Tribe asserts that its immunity extends to its corporation. For purposes of this appeal from a summary dismissal, we shall treat Thunderbird casino as an arm of the Tribe. On remand, the Tribe will have an opportunity to prove that it created Thunderbird Entertainment Center, Inc. as a distinct and separate entity and that the casino is not an arm of the Tribe for purposes of dram shop liability.

no and dismissed the action against the Tribe and Thunderbird casino. Plaintiff appealed.

¶ 6 The Court of Civil Appeals concluded that by enacting 18 U.S.C. § 1161,[3] Congress did not clearly and expressly authorize suits against Indian tribes for violations of state alcoholic beverage laws and did not clearly and expressly waive tribal sovereign immunity from suit in state courts. The Court of Civil Appeals also concluded that the Tribe's ordinance agreeing to comply with state alcoholic beverage laws did not clearly and expressly waive its tribal immunity. The Court of Civil Appeals affirmed the dismissal.

¶ 7 We previously granted plaintiff's petition for certiorari review. We vacate the opinion of the Court of Civil Appeals, reverse the district court's dismissal, and remand the case to the district court for further proceedings.

3. 18 U.S.C. § 1161 reads:

The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country **provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe** having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.
(Bold added.)

Section 1154 prohibits the furnishing of intoxicating liquor in Indian country and provides criminal penalties. Section 1156, with limited exceptions, prohibits the possession of intoxicating liquor in Indian country and provides criminal penalties. Sections 3113, 3488, and 3669 address forfeiture and destruction of intoxicating liquor illegally in Indian country and conveyances which are used to introduce or attempt to introduce liquor into Indian country and makes possession of intoxicating liquor in Indian country prima facie evidence of unlawful introduction of such intoxicants. Indian country is defined in 18 U.S.C. § 1151 as including lands and rights-of-way within an Indian reservation under federal jurisdiction, all dependent Indian communities, and all Indian allotments, the Indian titles to which have not been extinguished.

4. The *Potawatomi* case did not analyze the doctrine of immunity from suit in state court, and we do not find it especially helpful in this case. The substantive issue in *Potawatomi* was whether the state's tax law reached into Indian country to tax cigarettes sold by the tribe. *Potawatomi*

## II. The Parties' Arguments

¶ 8 In support of its motion to quash in the trial court, the Tribe contended that Oklahoma's courts lack subject matter jurisdiction and in personam jurisdiction in this case because the Tribe is a sovereign nation not subject to judicial attack absent authorization from Congress or an express waiver from the Tribe, citing *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), and *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).[4] *Manufacturing Technologies* ruled that the Kiowa tribe was immune from suit in state court on its contract whether the contract involved governmental or commercial activities and whether the contract was made on or off a reservation because 1) tribal immunity is a matter of feder-

ruled that the state may tax the cigarettes sold to the non-member purchasers in Indian country and that the tribe is obligated to collect the state taxes and remit the same to the state under *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and *Washington v. Confederated Tribes of the Colville Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).

In the *Potawatomi* case, the Tax Commission issued an assessment to collect delinquent state taxes from the tribe, a $2.7 million assessment, which, according to the Tax Commission, the tribe failed to collect from the consumer/user taxpayers when they purchased cigarettes at a tribal convenience store. The tribe filed suit in the federal district court to enjoin the enforcement of the tax assessment, and the Tax Commission filed a counterclaim for a money judgment on its tax assessment. The tribe moved to dismiss the counterclaim as barred by the doctrine of tribal sovereign immunity, and the Tax Commission responded that the tribe waived its immunity to suit in federal court by seeking an injunction. *Potawatomi* ruled that the tribe did not waive its immunity from suit in federal court by seeking injunctive relief and that Congress has never authorized suits against Indian tribes to collect state taxes. Although the *Potawatomi* decision did not discuss the legal incidence of the tax, the state's tax assessment in *Potawatomi* placed the consumer/user's tax burden squarely on the tribe, hence the need for congressional authorization. See *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 126 S.Ct. 676, 163 L.Ed.2d 429 (2005).

al law and is not subject to diminution by the states and 2) as a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived immunity.

¶9 The Tribe argued that 18 U.S.C. § 1161 authorizes a state to control the sale and distribution of alcoholic beverages within its borders through the licensing regulations, citing *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), but the statute is ambiguous as to the extent of the state's power of enforcement against a sovereign Indian nation and that the statute cannot be interpreted as authorizing a common law negligence action for dram shop liability against the Tribe. *Rice v. Rehner* decided that 1) a tribal member who operated a retail outlet inside the reservation had to comply with California liquor licensing requirements because there is no tradition of sovereign immunity that favors the Indians in the area of alcoholic beverage regulation, 2) Congress, in § 1161, delegated authority to the states and the Indian tribes to regulate alcoholic beverages, and 3) the activity in which Rehner wanted to engage might have substantial impact beyond the reservation.

¶10 Defending against the motion to quash, plaintiff relied on *Rice v. Rehner* for the proposition that there is no tradition of tribal sovereignty to regulate alcoholic beverages and that 18 U.S.C. § 1161 requires the states to regulate the possession and use of alcoholic beverages in Indian country. Plaintiff asserted the Tribe violated its duty under 37 O.S.2001, § 537(A)(2) to refrain from serving alcoholic beverages to an already intoxicated person and the breach of this duty resulted in the automobile collision and plaintiff's injuries for which Oklahoma law provides a negligence remedy under *Brigance v.*

*Velvet Dove Restaurant, Inc.*, 1986 OK 41, 725 P.2d 300, and *Copeland v. Tela Corp.*, 1999 OK 81, 996 P.2d 931. *Brigance* and *Copeland* recognized that relief from a breach of the duty in § 537(A)(2) may be sought in a common law negligence action.

¶11 Plaintiff argued that concurrent federal and state jurisdiction over alcoholic beverages in Indian country is justified by the state's unquestionable interests in liquor traffic within its borders particularly where, as here, the alcoholic beverage transactions in Indian country impact the state outside of Indian country. Plaintiff also argued that the Tribe and Thunderbird casino consented to suit in state court when the Tribe adopted an ordinance that tribal licensees shall comply with state law[5] and when Thunderbird casino agreed to comply with state law so it could secure a state license to serve alcoholic beverages for on-premises consumption at the casino.

¶12 On certiorari, plaintiff asserts that the Tribe is a sophisticated entity that engages in business and commerce and hires attorneys and other individuals with knowledge of state law to secure proper licenses to conduct business in this state and that the Tribe was fully aware it was agreeing to comply with state law and be sued in state court. Plaintiff argues that the Tribe is bound by the alcoholic beverage laws of Oklahoma, including Oklahoma's common law dram shop liability rule.

¶13 Opposing certiorari review, the Tribe contends that waiver of tribal sovereign immunity is a question of law to be decided by the court under established rules that a waiver cannot be implied, it must be unequivocal, and it must be strictly construed and that nothing less than a clearly expressed waiver will satisfy the rules. The

---

**5.** The appellate record includes a six-page document entitled "THE ABSENTEE SHAWNEE TRIBE OF OKLAHOMA ALCOHOL REGULATIONS." It appears the regulations apply to the sale and distribution of liquor and beer for **off-premises** consumption because regulation 1–08–03 prohibits an operator from allowing "any person to open or consume liquor on his or her premises or any premises adjacent thereto in his or her control." There is no tribal ordinance or regulation in the appellate record whereby the Tribe approved of the sale of liquor for **on-prem-**

ises consumption within the Tribe's Indian country. Under 18 U.S.C. § 1161, it appears that the Tribe must adopt such an ordinance to conform to state law allowing local option for liquor by the drink, Okla. Const., art. 28, § 4, and that such an ordinance must be certified by the Secretary of the Interior and published in the Federal Registry. We searched the Federal Registry for such an ordinance but found only the Tribe's regulations approving the sale of intoxicating beverages for off-premises consumption at 58 F.R. 14298–1 (Mar. 16, 1993).

Tribe submits, without argument, that congressional authorization of suit "is not at issue." The arguments in the trial court, however, unmistakably raise the question: Did Congress authorize the exercise of state court jurisdiction over Indians and Indian tribes when it enacted 18 U.S.C. § 1161?

### III. The Standard of Review

¶ 14 This appeal from a summary disposition order is treated as an appeal from summary judgment. Okla.Sup.Ct.R. 1.36, 12 O.S.2001, ch. 15, app. 1. A summary judgment is reviewed by a *de novo* standard. *Manley v. Brown*, 1999 OK 79, ¶ 22, 989 P.2d 448, 455. In deciding whether the state district court may exercise jurisdiction over this controversy, we address two basic issues: 1) whether 18 U.S.C. § 1161 authorizes the state courts to exercise jurisdiction over disputes alleging the Tribe's alcoholic beverage transactions did not conform to state law, and 2) if not, whether the Tribe's corporate economic enterprise waived tribal immunity when it secured an Oklahoma license to serve liquor by the drink at Thunderbird casino. These issues present questions of law to be reviewed *de novo*, without deference to the lower courts. *Kluver v. Weatherford Hosp. Auth.*, 1993 OK 85, 859 P.2d 1081.

### IV. The Tradition of Tribal Sovereign Immunity in Rice v. Rehner

¶ 15 We begin with an overview of the notion of Indian tribal sovereignty and the doctrine of tribal sovereign immunity. Tribal sovereignty and tribal sovereign immunity are rooted in the founding of our nation when the government of the United States assumed a protectorate relationship with the Indians and the dependent Indian tribe or nation retained its original natural right of self-government over members of the tribe within Indian country by consent of the dominant sovereign nation of the United States. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 542, 8 L.Ed. 483 (1832). Early on, Congress set aside reservations for the dependent Indian tribes.[6] The reservation tribes were viewed as distinct political communities with the inherent right to self-governance as a quasi-sovereign independent of the several sovereign states and in need of protection from state interference. *Worcester*, 31 U.S. at 551. By the late 19th Century, Congress changed to an allotment policy to assimilate the Indians as citizens of the United States, *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 254, 112 S.Ct. 683, 686, 116 L.Ed.2d 687 (1992), and then abandoned allotments, returning to a policy of tribal self-governance and retaining a policy of assimilation. Indian Reorganization Act, 25 U.S.C. §§ 461–476; *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). The 1934 Indian Reorganization Act authorized Indian tribes to organize. It was designed to encourage tribal enterprises to enter the commercial world on equal footing with other businesses. 411 U.S. at 157, 93 S.Ct. at 1275. Congress excluded Oklahoma Indians from the chartering provisions of the Indian Reorganization Act but granted them the rights and privileges allowed other recognized Indian tribes under the Act.[7]

6. The Commerce Clause, United States Constitution, Art. 1, § 8, cl. 3, provides that "Congress shall have Power to ... regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes...."

7. Section 473 of the Indian Reorganization Act excludes specifically named Indian tribes in Oklahoma, including the Shawnee tribe, from §§ 464, 467, 476, 477, and 478 (section 476 provides for the organization of Indian tribes). Legislative history indicates that Oklahoma Indians were excluded because of the assimilation progress and to avoid any potential encouragement of returning to reservations. *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (D.C.Cir. 1988). Two years later, in 1936, Congress provided for organization of Oklahoma Indians as discussed in footnote 1, *supra*.

In *Oklahoma Tax Commission v. United States*, 319 U.S. 598, 603, 63 S.Ct. 1284, 1286, 87 L.Ed. 1612 (1943), the United States Supreme Court recognized that Congress treated Oklahoma Indians differently. *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 171, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973), also recognized the difference:

[T]he Indian sovereignty doctrine, with its concomitant jurisdictional limit on the reach of state law ... has not been rigidly applied in cases where Indians have left the reservation and become assimilated into the general community. See, e.g., *Oklahoma Tax*

¶ 16 In view of the obligation of this Nation to protect the interests of the dependent Indian people, ambiguities in applicable treaties, agreements, or statutes are construed in favor of the Indian people. *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). In settling the tension between the right of the quasi-sovereign Indian tribes to govern their members in Indian country and the right of the sovereign states to govern all residents within their borders where Congress has not expressly authorized the state action, the tradition of tribal sovereignty is a backdrop for preemption analysis but not the determinative factor, *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and the doctrine of tribal sovereign immunity tests the state action for interference with the right of the self-governance but is not an absolute rule. *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In preemption analysis, the federal/tribal interests and the state interests are balanced within the specific context of the controversy to determine if federal law operates to preempt state law. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). The tribal interests are confined to the Indian tribe's internal affairs and tribal self-government consistent with the tribe's dependent status because an Indian tribe's retained inherent sovereign power is no greater than the tribe's dependent status and does not extend to activities involving non-members absent express congressional delegation of power. *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

¶ 17 With this historical perspective of the doctrine of tribal sovereign immunity, we turn to *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983). Rehner was a tribal member and a federally-licensed Indian trader who operated a general store on the Pala Reservation in San Diego, California. The Pala Tribe had an ordinance permitting the sale of liquor on the reservation as authorized by 18 U.S.C. § 1161.[8] Rehner asked California for an exemption from its license requirement to sell liquor for off-premises consumption. California denied the request and Rehner sought declaratory judgment in the federal district court. The district court decided that § 1161 required Rehner to have the state license and dismissed Rehner's petition.

¶ 18 In deciding whether sales of liquor inside the reservation were subject to California regulation under § 1161, *Rice v. Rehner* recognized that federal statutes have been consistently construed to reserve the Indian tribe's right to self-government and also recognized the recent trend toward a preemption analysis to determine whether a state could regulate activity within an Indian reservation. With obedience to the Indian law jurisprudence from *Worcester v. Georgia* in 1832 to *Montana v. United States* in 1981, *Rice v. Rehner* approached the preemption analysis upon the following precepts: 1) the goal of preemption analysis is to determine the congressional plan; 2) in preemption analysis, the tradition of tribal sovereignty is a backdrop against which the federal statute must be read; 3) tribal sovereignty, as a backdrop, informs the preemption analysis but does not determine preemption; 4) in preemption analysis, the role of tribal sovereignty varies with the traditions that accommodate the interests of the tribe and the federal government on the one hand and the state on the other; 5) if tradition has recognized a tribal sovereign immunity in favor of the Indians, then state law will be preempted unless Congress expressly provides otherwise; and 6) if there is no tradition of tribal sovereign immunity in favor of the Indians, preemption analysis may accord less weight to the backdrop of tribal sovereignty.

---

Comm'n v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943).

Before *McClanahan, Williams v. Lee,* 358 U.S. 217, 221, n. 6, 79 S.Ct. 269, 271, n. 6, 3 L.Ed.2d 251 (1959), noted a "series of statutes granting extensive jurisdiction over Oklahoma Indians to state courts." Also, *Organized Village of Kake v.*

Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), recognized the difference in Oklahoma's enabling legislation from that of nine western reservation states.

8. The text of 18 U.S.C. § 1161 is set out in footnote 3, *supra*.

¶ 19 *Rice v. Rehner* found that tradition had not recognized an inherent sovereign right of Indians or Indian tribes to regulate liquor. Rather, the tradition, since early colonial times, had been a complete prohibition against liquor in Indian country which is still in place subject to suspension conditioned on compliance with state law and tribal ordinance. *Rice v. Rehner* recognized the state and federal concurrent jurisdiction over alcoholic beverages in Indian country and no tradition of tribal sovereignty with respect to alcoholic beverages:

> This historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country is **justified by the relevant state interests involved** .... The State has an **unquestionable interest in the liquor traffic that occurs within its borders** .... "A state's regulatory interest will be particularly substantial if the State can **point to off-reservation effects that necessitate State intervention.**"
> There can be no doubt that Congress has divested the Indians of any inherent power to regulate in this area. In the area of liquor regulation, we find no "congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development." **With respect to the regulation of liquor** transactions, as opposed to the state income taxation involved in *McClanahan*, **Indians cannot be said to "possess the usual accouterments of tribal self-government."**
> The court below erred in thinking that there was some *single* notion of tribal sovereignty that served to direct *any* preemption analysis involving Indians. Because we find that there is no tradition of sovereign immunity that favors the Indians in this respect, and because we must consider that the activity in which Rehner seeks to engage potentially has a substantial impact beyond the reservation, we may accord little if any weight to any asserted interest in tribal sovereignty in this case.

*Rice v. Rehner*, 463 U.S. at 723–725, 103 S.Ct. at 3298–3299(citations and footnotes omitted and bold added).

¶ 20 Turning to the federal statute, 18 U.S.C. § 1161, *Rice v. Rehner* reviewed the legislative history and found congressional intent 1) to remove the discriminatory federal prohibition against intoxicating liquor in Indian country, 2) to have state laws of their own force govern tribal liquor transactions, and 3) to require Indians to comply with state liquor laws in every regard. 463 U.S. at 726–727, 103 S.Ct. at 3299–3300. *Rice v. Rehner* mentioned that in official and unofficial reports to the House of Representatives, the Department of Interior stated that the "federal prohibition would be lifted only if liquor 'transactions are in conformity with the ordinances of the tribe concerned and are not contrary to State law.'" 463 U.S. at 727, 103 S.Ct. at 3300. Congress, however, did not use the Department's language "not contrary to state law," instead Congress used the language "in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe." *Rice v. Rehner* referred to a 1954 administrative opinion of the Solicitor of the Interior assuming that § 1161 would result in state prosecutions and noted the Department of Interior changed its opinion in 1971. 463 U.S. at 730, n. 13, 103 S.Ct. at 3301, n. 13. The *Rice v. Rehner* dissent relied on the 1971 opinion that the intent of § 1161 was merely to require the use of state liquor laws as the standard of measurement to define lawful and unlawful activity on the reservation. Rejecting the 1971 opinion, *Rice v. Rehner* said:

> It is clear then that Congress viewed § 1161 as abolishing federal prohibition, and as legalizing Indian liquor transactions as long as those transactions conformed both with tribal ordinance and state law. It is also clear that Congress contemplated that its absolute but not exclusive power to regulate Indian liquor transactions would be delegated to the tribes themselves, and to the States, which historically shared concurrent jurisdiction with the federal government in this area. Early administrative practice and our prior decision in *United States v. Mazurie, supra* [419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) ], confirm this understanding of § 1161.

463 U.S. at 727, 103 S.Ct. at 3300–3301.

¶ 21 In light of the clear congressional intent, *Rice v. Rehner* refused to read

§ 1161 *in para materia* with Public Law 280, 28 U.S.C. § 1360(a).[9] Based on the language of the statute itself and its legislative history, *Rice v. Rehner* concluded that Congress authorized, rather than preempted, state regulation over Indian liquor transactions.

We conclude that § 1161 was intended to remove federal discrimination that resulted from the imposition of liquor prohibition on Native Americans. Congress was well aware that the Indians never enjoyed a tradition of tribal self-government insofar as liquor transactions were concerned. Congress was also aware that the states exercised concurrent authority insofar as prohibiting liquor transactions was concerned. By enacting § 1161, Congress intended to delegate a portion of its authority to the tribes as well as to the States, so as to fill the void that would be created by the absence of the discriminatory federal prohibition. Congress did not intend to make tribal members "super citizens" who could trade in a traditionally regulated substance free from all but self-imposed regulations. See [*Rehner v. Rice*] 678 F.2d [1340] at 1352 [ (C.A.9 1982) ] (Goodwin, J., dissenting). Rather, we believe that in enacting § 1161, Congress intended to recognize that Native Americans are not "weak and defenseless," and are capable of making personal decisions about alcohol consumption without special assistance from the Federal Government. Application of the state licensing scheme does not "impair a right granted or reserved by federal law." *Kake Village, supra,* 369 U.S., at 75, 82 S.Ct., at 571. On the contrary, such application of state law is "specifically authorized by ... Congress ... and [does] not interfere with federal policies concerning the reservations." *Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 687, n. 3, 85 S.Ct. 1242, 1243, n. 3, 14 L.Ed.2d 165 (1965).

463 U.S. at 733–734, 103 S.Ct. at 3303–3304(footnote omitted).

¶ 22 We are confident that application of the doctrine of tribal sovereign immunity in this case would indeed make the Tribe a "super citizen" that can trade in heavily-regulated alcoholic beverages, free from all but self-imposed regulation. Although the specific concern in *Rice v. Rehner* was whether the reservation retail outlet had to have a state license to sell liquor, we think it is the authority to be followed in the instant matter. *Rice v. Rehner* very clearly ruled that Indians did not have the inherent attributes of sovereignty to regulate in the area of alcoholic beverages. It is the sovereignty that gives rise to the immunity from private suit in order to protect the dignity of the sovereign.[10] *Rice v. Rehner* concluded that the Indians there had no tribal immunity from state alcoholic beverage law. Accordingly, *Rice v. Rehner* supports the exercise of this state's adjudicatory power over this private suit.

## V. Tribal Immunity from Suit in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.

¶ 23 *Rice v. Rehner* did not definitively decide that a private person may sue an Indian tribe in state court for violating the state alcoholic beverage laws. While this state has a strong interest in ensuring that its citizens have judicial remedies available to redress wrongs, any finding of state court jurisdiction must be consistent with the authoritative decisions concerning the right to maintain a suit by or against an Indian or Indian tribe in state, federal or tribal court.

¶ 24 Two early decisions that have been cited several times as the authority for the principle that an Indian tribe is subject to suit only where Congress has authorized the suit or the Indian tribe has waived its immunity are *Turner v. United States,* 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919), and *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84

---

9.  Public Law 280 allowed states to extend state court jurisdiction over Indian country. Oklahoma is considered a disclaimer state that had to take formal steps to remove its constitutional prohibition against exercising jurisdiction over Indian country. *See State ex rel. May v. Seneca-*

*Cayuga Tribe of Oklahoma,* 1985 OK 54, 711 P.2d 77.

10.  Immunity from private suit is central to sovereign dignity. *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

L.Ed. 894 (1940). *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), stripped these two early decisions of their authoritative value in this regard. The majority opinion in *Manufacturing Technologies* discredited *Turner* as authority for the doctrine of tribal sovereign immunity, while the dissenting opinion discredited *U.S.F. & G.* as authority for the doctrine.

¶ 25 The landmark case holding Indians are immune from suit in state court is *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In *Williams,* an Indian trader who operated a general store on the Navajo Indian Reservation in Arizona filed suit in state court to collect for goods sold on credit to reservation Indians. The Arizona Supreme Court decided that the state courts had jurisdiction over civil suits by non-Indians against Indians even though the action arose on an Indian reservation. *Williams* viewed the collection suit in state court against tribal members as undermining the authority of the tribal courts over reservation affairs and found it would infringe upon the right of reservation Indians to make their own laws and be ruled by them. *Williams* held that under the circumstances, suit in state court must be expressly authorized by Congress. 358 U.S. at 219–220, 79 S.Ct. at 270.

¶ 26 *Manufacturing Technologies* relied on *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), for the doctrine of tribal immunity from suit. In *Martinez,* a tribal member sued the tribe in federal court challenging the tribe's refusal to enroll children of a female member who married outside the tribe as a violation of equal protection under the Indian Civil Rights Act. 25 U.S.C. § 1302(8). *Martinez* found that tribal forums were available to vindicate Indian civil rights and that subjecting a dispute that arose on the reservation among reservation Indians to a forum other than the one they had established for themselves would interfere with tribal autonomy and self-government. Considering the Indian Civil Rights Act against a backdrop of tribal sovereignty, *Martinez* refused to find that the Indian Civil Rights Act implied a federal remedy other than by writ of habeas corpus.

¶ 27 *Manufacturing Technologies* also relied on *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 890, 106 S.Ct. 2305, 2312–2313, 90 L.Ed.2d 881 (1986), for the doctrine of tribal immunity from suit. In *Three Affiliated Tribes,* the Indian tribe filed suit in state district court for negligence and breach of a contract for the construction of an on-reservation water system, and the defendant moved to dismiss because the tribe had not consented to state court jurisdiction. The North Dakota Supreme Court decided the state legislature had disclaimed jurisdiction over Indians and Indian tribes. The United States Supreme Court found that the Indian tribe had no other effective means of securing relief for civil wrongs because even if the tribal court had jurisdiction to adjudicate the controversy, it would be unable to enforce its judgment; and that there is a strong federal interest in ensuring that all citizens have access to the courts. *Three Affiliated Tribes* established that an Indian tribe may file suit in state district court without the necessity of a broad waiver of immunity from suit in state court.

¶ 28 More recently, the United States Supreme Court considered whether tribal courts have jurisdiction over non-members' tort claims. In *Nevada v. Hicks,* 533 U.S. 353, 386, 121 S.Ct. 2304, 2324, 150 L.Ed.2d 398 (2001), state and state officers sought a declaratory judgment in the federal district court that the tribal court lacked jurisdiction over a tort action alleging a 42 U.S.C. § 1983 claim against state officers. *Nevada v. Hicks* held that the tribal court did not have jurisdiction to adjudicate tort claims arising out of the state officials' execution of process on reservation land searching for evidence of an off-reservation crime. In so holding, *Nevada v. Hicks* recognized that there is an historical and constitutional assumption of state court jurisdiction concurrent with the federal courts under our system of dual sovereignty, that state court jurisdiction is general and plenary, and that tribal court jurisdiction cannot be general jurisdiction because a tribe's inherent adjudicative jurisdiction

over nonmembers is at most only as broad as its legislative jurisdiction.

¶ 29 In *Manufacturing Technologies,* the tribe executed a promissory note to buy stock in a commercial enterprise. The note contained a clause that it did not subject or limit the sovereign rights of the tribe. When the tribe defaulted on the note, Manufacturing Technologies sued in state court. *Manufacturing Technologies* determined that 1) tribal immunity is a matter of federal law and is not subject to diminution by the states; 2) as a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived immunity; and 3) Congress has not dispensed with or limited the rule of tribal immunity from suit. *Manufacturing Technologies* ruled: "Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation. Congress has not abrogated this immunity, nor has petitioner waived it, so the immunity governs this case." 523 U.S. at 760, 118 S.Ct. at 1705.

¶ 30 In the instant matter, the Tribe argued that the ruling in *Manufacturing Technologies* bars the state court from exercising jurisdiction over it. *Manufacturing Technologies* does not apply here. This case does not involve a contract nor does it affect the Tribe's membership or the Tribe's right to govern its members. This case does not interfere with the Tribe's internal affairs or tribal government that barred the exercise of adjudicatory power in *Williams v. Lee* and *Santa Clara Pueblo v. Martinez.* Here, we have a tort action alleging the Tribe allowed excessive amounts of alcoholic beverages to be served to an intoxicated patron at the Tribe's casino and did nothing to prevent the intoxicated patron from leaving the casino,

driving on the public roads and highways while intoxicated, and causing injury. As in *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* there is a strong federal interest in ensuring all citizens have access to courts. And, as recognized in *Nevada v. Hicks,* there is an historical and constitutional assumption of state court jurisdiction concurrent with the federal courts under our system of dual sovereignty. In our study of the Indian law jurisprudence, we have found no authoritative decision supporting the doctrine of tribal immunity from suit by a nonmember alleging violation of state alcoholic beverage laws.

## VI. 18 U.S.C. § 1161

¶ 31 While *Rice v. Rehner* rejected the notion of tribal sovereignty to regulate alcoholic beverages, *Manufacturing Technologies* mechanically applied the notion of tribal sovereignty to bar state court jurisdiction over contracts. In deciding whether 18 U.S.C. § 1161 [11] permits a private person to maintain a suit in state court alleging dram shop liability against an Indian tribe, we must avoid doing violence to *Rice v. Rehner* and *Manufacturing Technologies.* We must decide whether the words "laws of the State" [12] in 18 U.S.C. § 1161 authorize the exercise of state court jurisdiction over the Tribe for alleged violation of the state alcoholic beverage statutes.

¶ 32 Undoubtedly, § 1161 decriminalized liquor transactions in Indian country and opened Indian country to state laws governing alcoholic beverages. When Congress enacted § 1161, state law governed activities involving alcoholic beverages. *Craig v. Boren,* 429 U.S. 190, 205, 97 S.Ct. 451, 461, 50 L.Ed.2d 397 (1976). Early on, Congress left liquor regulation to the states [13] and the

---

11. The text of 18 U.S.C. § 1161 is set forth in footnote 3.

12. Recent congressional enactments provide that "state law" includes state statutes, regulations, and principles and rules having the force of law, 27 U.S.C. § 214(11), and "state law" includes all laws, decisions, rules, regulations, or other state action having the effect of law of any state. 29 U.S.C. § 1191.

13. The Wilson Act, 27 U.S.C. § 121, a 1890 act of Congress, subjected intoxicating liquor transported into a state to the operation and effect of the laws of the state enacted in the exercise of its police powers to the same extent as if the intoxicating liquor was produced in the state. *Craig v. Boren,* 429 U.S. at 205, n. 18, 97 S.Ct. at 461, n. 18. The Webb–Kenyon Act, a 1913 act of Congress, prohibited the shipment of intoxicating liquor from one state to another for use in the other state in violation of any law of the other

United States Supreme Court upheld state court remedies provided to third parties aggrieved by tavern keepers furnishing alcoholic beverages. *Eiger v. Garrity*, 246 U.S. 97, 38 S.Ct. 298, 62 L.Ed. 596 (1918). *Eiger v. Garrity* upheld an Illinois statute that subjected the premises of a dram shop to a lien for damages recovered by the wife against the tavern owner who furnished the husband intoxicating liquor. In so ruling, *Eiger v. Garrity* said:

> In view of the broad authority of the states over the liquor traffic, and the established right to prohibit or regulate the sale of intoxicating liquors, we are unable to discover that there has been a deprivation of property rights in the legislation in question in violation of due process of law secured by the Fourteenth Amendment.

¶ 33 The Twenty-first Amendment [14] to the Constitution of the United States gives states considerable regulatory power not strictly limited to importing and transporting intoxicating liquors. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 107, 100 S.Ct. 937, 944, 63 L.Ed.2d 233 (1980). Each state holds great powers over the importation and transportation of intoxicating liquors, *State Bd. of Equalization of California v. Young's Market Co.*, 299 U.S. 59, 63–64, 57 S.Ct. 77, 78–79, 81 L.Ed. 38 (1936), with wide latitude in regulation of intoxicating liquors, *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 42, 86 S.Ct. 1254, 1256, 16 L.Ed.2d 336 (1966). Other constitutional provisions may limit the exercise of the state's police power in regulating intoxicating liquor pursuant to the Twenty-first Amendment. State liquor laws cannot violate the Equal Protection Clause, *Craig v. Boren*, 429 U.S. 190, 204–209, 97 S.Ct. 451, 460–463, 50 L.Ed.2d 397 (1976), the Due Process Clause, *Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515 (1971), the Export–Import Clause, *Department of Revenue v. James Beam Co.*, 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964), or the Commerce Clause, *Hostetter v. Idlewild Liquor Corp.*, 377 U.S. 324, 331–332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964).

¶ 34 There is no bright line between the states' virtually unfettered power over the distribution and sale of intoxicating liquors and Congress' commerce power in situations where the state regulation of intoxicating liquor prevents enforcement of a federal law, such as antitrust laws. *California Retail Liquor Dealers Assoc'n v. Midcal Aluminum, Inc.*, 445 U.S. at 110, 100 S.Ct. at 946. The competing state and federal interests must be reconciled. *Id.* Even so, there can be no doubt that when Congress enacted § 1161, it was well aware of the breadth of the state's authority over alcoholic beverages, which involved the

state. *Id.* 429 U.S. at 205, n. 19, 97 S.Ct. at 461, n. 19.

*In re Heff* 197 U.S. 488, 507, 25 S.Ct. 506, 511, 49 L.Ed. 848 (1905), explained:

In this Republic there is a dual system of government, national and state. Each within its own domain is supreme, and one of the chief functions of this court is to preserve the balance between them, protecting each in the powers it possesses, and preventing trespass thereon by the other. The general police power is reserved to the states, subject, however, to the limitation that in its exercise the state may not trespass upon the rights and powers vested in the general government. The regulation of the sale of intoxicating liquors is one of the most common and significant exercises of the police power. And so far as it is an exercise of the police power it is within the domain of state jurisdiction. It is true the national government exacts licenses as a condition of the sale of intoxicating liquors, but that is solely for the purpose of revenue, and is no attempted exercise of police power.

14. Possession of intoxicating liquor was prohibited in 1919 when the Eighteenth Amendment was ratified, and the Eighteenth Amendment was repealed in 1933 when the Twenty-first Amendment was ratified. Similar to the broad language in the Webb–Kenyon Act, Section 2 of the Twenty-first Amendment prohibits the transportation of intoxicating liquors into a state in violation of the state laws.

The pertinent part of the Twenty-first Amendment to the Constitution of the United States reads:

SECTION 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

SECTION 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

states' adjudicatory authority as well as its legislative authority.

¶ 35 The Tribe argued that a private person may not sue the Tribe under the state liquor laws because a private person may not exercise the state's police power. This position, of course, fails to recognize that police power is exercised when the legislature enacts a law that restricts the behavior of a tavern keeper and when it enacts a law allowing a tavern keeper's property to be taken to cover the costs of damages suffered by innocent third parties, as explained in *Eiger v. Garrity*. Neither the filing of a suit in court alleging dram shop liability nor the maintaining of the suit involves police power [15] and the Tribe cites no authority otherwise. The Tribe acknowledged that § 1161 might allow the state to bring an action in state court against the Tribe to enforce the state liquor laws, even though it urged a private party cannot. With this acknowledgment, the Tribe tacitly concedes that Congress intended the Tribe to be subject to state court jurisdiction when it enacted § 1161.

¶ 36 *Rice v. Rehner* read § 1161 as a delegation of authority over alcoholic beverages in Indian country to the states to exercise their police power to protect the congressional decision in favor of the states and as a delegation of congressional licensing authority to the Indian tribes. 463 U.S. at 731, 103 S.Ct. at 3301–3302. *Rice v. Rehner* rejected an argument that *United States v. Mazurie*, 419 U.S. 544, 547–548, 95 S.Ct. 710, 713, 42 L.Ed.2d 706 (1975), recognized Indian tribes possessed independent authority over liquor transactions and state laws are generally not applicable to Indians in Indian country unless expressly provided by Congress. *Rice v. Rehner* said "because of the lack of a tradition of self-government in the area of liquor regulation it is not necessary that Congress

indicate expressly that the state has jurisdiction . . . ." 463 U.S. at 731, 103 S.Ct. at 3302.

¶ 37 Consistent with *Rice v. Rehner*, we reject the Tribe's argument that § 1161 does not authorize the state courts to exercise jurisdiction over the Tribe because the statute does not expressly state, in plain and precise words, that an Indian tribe shall be subject to state court jurisdiction. The words "laws of the State" in § 1161 are comprehensive and under *Rice v. Rehner*, include state authority over alcoholic beverages whether it is legislative, executive, or adjudicative in nature.

¶ 38 Here, the state statute imposes a duty on a mixed beverage license holder not to serve alcohol beverages to an intoxicated person and our extant jurisprudence recognizes the right of an individual injured by the breach of that statutory duty to maintain a negligence action against the dram shop. This state law remedy is consistent with *Eiger v. Garrity*. It is consistent with federal principles that those for whom a statutory duty is imposed are entitled to recover damage caused by the breach of the statutory duty and that the denial of a remedy is the exception rather than the rule. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 374–375, n. 52 & 53, 102 S.Ct. 1825, 1837, n. 52 & 53, 72 L.Ed.2d 182 (1982). This state law remedy to recover money damages furthers the legitimate objectives of the state's liquor laws. We reject the Tribe's argument that dram shop liability should be excluded from the words "laws of the State" in § 1161.

## VII. The Oklahoma Alcoholic Beverage Control Act and Dram Shop Liability

¶ 39 The Oklahoma Alcoholic Beverage Control Act, 37 O.S.2001, §§ 501, *et. seq.*, is a comprehensive statutory scheme to regulate alcoholic beverages "for the protection of the

---

15. The states' police power embraces the protection of lives and property for the public health and welfare, the maintenance of good order for public safety, and the preservation of good morals. *Patterson v. State of Kentucky*, 97 U.S. 501, 7 Otto 501, 24 L.Ed. 1115 (1878). The foundation of the states' police power is the control and regulation of private interests for the public

good. In the control and regulation of alcoholic beverages, the states' police power is strengthened by the broad sweep of the 21st Amendment to the U.S. Const. *Oklahoma Alcoholic Bev. Control Bd. v. Heublein Wines, Internat.*, 1977 OK 136, ¶ 19, 566 P.2d 1158, 1162, citing *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972).

welfare, health, peace, temperance and safety of the people of the state." 37 O.S.2001, § 503(A). The regulatory scheme requires that any person must obtain a license from the Alcoholic Beverage Law Enforcement Commission (ABLE Commission) before engaging in virtually any aspect of the alcoholic beverage industry, including brewing, distilling, importing, transporting, delivering, storing, selling or furnishing alcoholic beverages in this state.[16] 37 O.S.2001, § 518; *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n,* 1988 OK 117, ¶ 2, 764 P.2d 172, 175. The regulatory scheme provides the right to an administrative hearing, 37 O.S.2001, § 530, with appeal to the state courts, *id.* at § 531, before a license may be denied, suspended or revoked, *id.* at § 528. The regulatory scheme specifies acts that a licensee may do, *id.* at § 521; specifies acts that a licensee may not do,[17] *id.* at § 537; and declares various prohibited acts to be crimes and specifies criminal penalties.[18] *Id.* at § 538. The regulatory scheme also imposes an excise tax on alcoholic beverages, *id.* at § 553, as a direct tax on the ultimate retail consumer, *id.* at § 562, and a gross receipts tax directly on holders of mixed beverage licenses. *Id.* at § 576.

¶ 40 Included in the litany of statutorily-prohibited acts is the prohibition against selling, delivering, or knowingly furnishing "alcoholic beverages to an intoxicated person," *id.* at § 537(A)(2), a violation of which is declared to be a felony subject to monetary fine between $500.00 and $1,000.00 and/or imprisonment for no longer than one year. *Id.* at § 538(G). Extant jurisprudence also holds that § 537(A)(2) imposes a duty upon a license holder to refrain from furnishing alcoholic beverages to intoxicated persons and that a license holder who furnishes alcoholic beverages to an intoxicated person may be

summoned into state district court in a common law negligence action to recover for injury caused by the breach of that duty. *Brigance v. Velvet Dove Restaurant, Inc.,* 1986 OK 41, 725 P.2d 300; *Copeland v. Tela Corp.,* 1999 OK 81, 996 P.2d 931.

¶ 41 *Brigance* abolished the common law non-liability of dram shops, finding a duty imposed by statute and common law principles upon commercial vendors to exercise reasonable care in serving alcoholic beverages to their customers. 725 P.2d at 304. *Brigance* adopted a rule of dram shop liability grounded in common law negligence:

> We hold that public policy is better served by holding that the common law principles of negligence are applicable where a commercial vendor for on the premises consumption is shown to have sold or furnished intoxicating beverages to a person who was noticeably intoxicated from which a jury could determine such conduct creates an unreasonable risk of harm to others who may be injured by the person's impaired ability to operate a motor vehicle.

*Id.* at 305 (footnote omitted). Here, the merits of plaintiff's negligence action are not before us. Plaintiff will have an opportunity to prove the elements of common law negligence under *Brigance* before the trial court on remand.

¶ 42 *Brigance* relied heavily on the analysis and reasoning of the New Jersey Supreme Court in *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1 (1959). The New Jersey court viewed dram shop liability as compelling obedience to the statutory obligations imposed on license holders:

> But we are convinced that recognition of the plaintiff's claim will afford a fairer measure of justice to innocent third parties whose injuries are brought about by the unlawful and negligent sale of alcoholic

---

16. Article 28 of the Oklahoma Constitution sets forth the scheme for regulating alcoholic beverages. Article 28, § 5, Okla. Const., makes it unlawful for a licensee to sell or furnish alcoholic beverages to a person who is intoxicated.

17. The regulatory scheme includes numerous other prohibitions, such as, no public officer or employee may engage in an alcoholic beverage business, 37 O.S.2001, § 511A; no advertising, *id.* at § 516; no liquor retail business within

proximity of school or church, *id.* at § 518.3; and no demonstration of explicit sexual acts at a dram shop. *Id.* at § 537.2.

18. Other criminal penalties are imposed throughout the statutory scheme and other means of enforcement are spelled out including search and seizure of alcoholic beverages by warrant and forfeiture by state court order. *Id.* at § 539.

beverages to minors and intoxicated persons, will strengthen and give greater force to the enlightened statutory and regulatory precautions against such sales and their frightening consequences, and will not place any unjustifiable burdens upon defendants who can always discharge their civil responsibilities by the exercise of due care.... Liquor licensee, who operate their businesses by way of privilege rather than as of right, have long been under strict obligation not to serve minors or intoxicated persons and if, as is likely, the result we have reached in the conscientious exercise of our traditional judicial function substantially increases their diligence in honoring that obligation then the public interest will indeed be very well served.

*Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1, 10 (1959).

¶ 43 Congress enacted a similar prohibition on dram shops for the District of Columbia. The District of Columbia Court of Appeals, in *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* explained:

Congress in 1934 clearly was aware of the public safety hazards associated with alcohol abuse and incorporated safety concerns as an integral part of its comprehensive scheme to regulate the sale and use of alcohol in the nation's capitol. Senator Sheppard, who supported Prohibition, and opposed the legislation regulating the reintroduction of alcohol in the District of Columbia, was certain that among the many evils associated with the substance was that it "multiplies the hazards on our streets and highways, imperiling the lives of motorists, pedestrians, and little children." 78 Cong.Rec. 698 (1934)....

Congress understood that it was regulating a dangerous substance, and that the potential for injury and accident associated with intoxication is amplified when the intoxicated person is placed at the controls of a mechanical device, particularly one involved in transportation. When, as alleged in this case, an intoxicated customer who has been served liquor in violation of the Alcoholic Beverage Control Act crashes his car shortly after departing from defendant's establishment, injuring

third parties, we believe that a harm has occurred which § 25–121(b) was designed to prevent and that the doctrine of negligence *per se* should apply.

Our view is not mitigated by the proposition that public safety may have been only a *partial* purpose of the legislation.... Liquor control laws frequently have multiple purposes ... and our courts have held that "a liberal and reasonable construction shall be given these statutes in view of their remedial objects and purposes so as to effect the[se purposes].... "

534 A.2d 1268, 1275–1276 (D.C.1987), appeal after remand and reversed and remanded on other grounds by, 699 A.2d 348 (D.C.1997) (footnote noting that since 1934 the evidence has mounted of the hazards associated with drinking and driving omitted); *Jarrett v. Woodward Bros., Inc.,* 751 A.2d 972 (D.C. 2000).

¶ 44 Congress enacted a regulatory scheme for the District of Columbia much like the regulatory schemes enacted by state legislatures. Congress and state legislatures prohibited commercial vendors from serving intoxicating beverages to intoxicated persons. Today, under congressional regulation as well as under state regulation, barrooms and taverns have civil liability for damages caused by knowingly furnishing alcoholic beverages to noticeably intoxicated persons. As the New Jersey Court explained in *Rappaport v. Nichols,* dram shop liability strengthens the statutes regulating alcoholic beverages and, as enunciated in *Brigance,* also strengthens the underlying public policy to protect the welfare, health, peace, temperance, and safety of the people of the state.

¶ 45 In summary, the Oklahoma Alcoholic Beverage Control Act is a comprehensive scheme to regulate alcoholic beverages within this state enacted by the Legislature through the exercise of its police power and taxation power. The Act provides for enforcement through the exercise of the executive power of specific state agencies and through the exercise of the judicial power over cognizable controversies, criminal and civil. Accordingly, the Oklahoma Alcoholic Beverage Act subjects holders of licenses

issued pursuant to that Act to the criminal and civil jurisdiction of the state courts.

## VIII.  Waiver of Tribal Sovereign Immunity

¶ 46 If the Tribe has any immunity from judicial enforcement of the alcoholic beverage laws, which we have found that it does not as discussed above, then we consider whether the Tribe has waived its tribal sovereign immunity.  The doctrine of tribal sovereign immunity may extend to tribal enterprises sometimes termed corporations.[19]

¶ 47 Waiver for a federally-recognized tribe to be sued must be unequivocal. *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001).  However, an effective waiver does not require specific or magic words. 532 U.S. at 422, 121 S.Ct. at 1595–1596.  In the licensing application, Thunderbird casino agreed to be bound by the laws of the State of Oklahoma.  The Tribe concedes that the State can regulate the alcoholic beverage transactions at Thunderbird casino pursuant to the state's police power but it argues that the state's police power cannot be delegated to a private individual for regulating its liquor laws.

¶ 48 Under 18 U.S.C. § 1161, the Tribe and Thunderbird casino must comply with state laws to avoid federal criminal sanctions for serving liquor by the drink at the casino in Indian country.[20]  As required by state law, Liza Frazier, the president of Thunderbird casino, applied for a mixed beverage license.  In the application, Frazier averred that 1) she had read and understood Oklahoma laws and regulations regarding the license she was seeking, 2) she would continue to familiarize herself with such laws, and 3) she would not violate any of the laws of the United States, the State of Oklahoma, or applicable municipal ordinances.

¶ 49 One of the laws to which Thunderbird casino agreed to be bound is 37 O.S.2001, § 537(A)(2).  Section 537(A)(2) prohibits a person from selling, delivering, or knowingly furnishing "alcoholic beverages to an intoxicated person...."  Oklahoma law provides for enforcement of section 537(A)(2) as well as other of its alcoholic beverage regulations. As previously discussed, revocation is one statutory mechanism for enforcement of § 537(A)(2), *id.* at § 528(C)(1), with the right of appeal to the district court from an unfavorable administrative decision.  *Id.* at §§ 530–531.  Thunderbird casino acknowledged that the ABLE Commission can regulate their conduct pursuant to the police power of the state because it agreed to be bound by the Oklahoma Beverage Control Act (the Act).  *Id.* at §§ 501–599.

¶ 50 Another statutory enforcement mechanism is criminal prosecution.  Section 538(G) makes it a felony to knowingly sell,

---

**19.** The United States Supreme Court has not formulated a test to determine when a tribe's immunity extends to a tribal enterprise such as Thunderbird casino.  Some courts find that *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., supra.,* supports a rule that tribal immunity extends to tribal enterprises "incorporated" under tribal ordinances.  *See Wright v. Colville Tribal Enterprise Corp.*, 159 Wash.2d 108, 147 P.3d 1275, 1278 (2006).  We do not think that *Manufacturing Technologies* supports such a rule.  *Manufacturing Technologies* teaches that the nature and the location of the activity of the Indian tribe at issue in a suit is not relevant to determining whether a tribe is immune from suit, but it did not address whether the tribal entity enjoyed the same immunity.

In *Inyo County, Calif. v. Paiute–Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 705 n. 1, 123 S.Ct. 1887, 1890, 155 L.Ed.2d 933 (2003), the United States Supreme Court first utilized the "arm" of the tribe language in referring to a tribal "corporation"

but it did not address whether such a "corporation" would share in the tribe's immunity or the criteria for a tribal "corporation" to be an arm of the tribe.

**20.** As discussed earlier in this opinion, 18 U.S.C. § 1161 exempts from federal criminal sanctions acts or transactions involving liquor if done in compliance with state laws and tribal ordinances.  The United States Supreme Court has stated:  "It is clear, however, that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987) (addressing the application of Public Law 280 to allow enforcement of state law to bingo and card club on reservation).  We note again, there is no evidence in this record which establishes that Thunderbird casino is located in Indian country.

furnish, or give an alcoholic beverage to an intoxicated person. Other provisions of § 538 attach criminal penalties for violations of other state liquor laws. It follows from the Tribe's position that Thunderbird casino agreed to be subject to the ABLE Commission's enforcement of Oklahoma's liquor laws because such enforcement mechanisms are found in the Act. They have also agreed to be subject to the criminal penalties found in the Act. By agreeing to be bound by the Act's enforcement mechanisms, Thunderbird casino waived any objection to the subject matter jurisdiction of the state courts since the criminal penalties are enforceable only in Oklahoma state courts under § 538.

¶ 51 Civil action for damages is yet another means to assure compliance with § 537(A)(2). As discussed earlier, *Brigance v. Velvet Dove Restaurant, Inc.*, 1986 OK 41, 725 P.2d 300, ruled that a commercial vendor could be held liable in a private cause of action for failing to exercise reasonable care in selling or furnishing alcoholic beverages to an intoxicated person who subsequently injures a third party. *Brigance* is a part of Oklahoma's law, although the Tribe argued that dram shop liability is not statutory and not a part of the State's police power. We reject this argument for two reasons. First, Thunderbird casino did not agree to limited enforcement of the alcoholic beverage statutes. Second, a common law negligence action based on violation of Oklahoma's alcoholic beverage statutes is no less a part of this state's regulation of alcoholic beverages for the health, welfare and safety of the public than is license revocation with appeal to the state district court.

¶ 52 As the Tribe acknowledges, Thunderbird casino's agreement to be bound by state law constitutes a waiver of any immunity to the subject matter jurisdiction of the Oklahoma courts when the state initiates a proceeding alleging that Thunderbird casino violated the alcoholic beverage statutes. Thunderbird casino's subjugation of tribal immunity was not limited to enforcement by the state through the regulatory processes and criminal processes. There is nothing in

Thunderbird casino's agreement to be bound by the laws of this state which limits the state's enforcement mechanisms, and we will not find a limitation that is not there.

¶ 53 In 1986, *Brigance* recognized dram shop liability sounding in tort for the negligent serving of alcoholic beverages to an intoxicated person. Since 1986, the alcoholic beverage statutes have been amended several times, particularly sections 537, 528, and 538.[21] None of the amendments undermine *Brigance*. The common law negligence remedy to recover for dram shop liability is no less a part of Oklahoma's law than is the administrative and criminal adjudicatory processes established by the Legislature to assure the public safety under the Act. We find that the distinction placed by the Tribe on Oklahoma's methods of promoting its public policies is unconvincing. Thunderbird casino agreed to be bound by the laws of this state and thereby waived any immunity it may have had to suit in the Oklahoma courts including a common law negligence action for dram shop liability.

## IX. Conclusion

¶ 54 *Rice v. Rehner* concluded that there is no tradition of tribal sovereign immunity in the area of alcoholic beverage regulation and that Congress, in 18 U.S.C. § 1161, authorized the states and the Indian tribes to regulate alcoholic beverages. While *Rice v. Rehner* teaches there is no tribal immunity from suit to be abrogated, § 1161 abrogates any tribal immunity from suit in the area of alcoholic beverage laws. *Manufacturing Technologies* recognized that tribal sovereign immunity is a matter of federal law, and under the above federal law, the Tribe has no sovereign tribal immunity from plaintiff's negligence action.

¶ 55 The Tribe, doing business under the name of Thunderbird Entertainment Center, Inc., owns and operates a casino. It chose to also become an alcohol vendor at its casino. It applied for and obtained a state license to sell liquor by the drink at the casino under the laws of the State of Oklahoma. Okla-

21. Some of the amendments were made in the following session laws: 1988 Okla.Sess.Laws, ch. 237; 1989 Okla.Sess.Laws, ch. 3; 1991 Okla. Sess.Laws, chs. 280 and 335; 1994 Okla.Sess. Laws, ch. 361; and 1997 Okla.Sess.Laws, chs. 133 and 364.

homa's alcoholic beverage laws protect the public, as in this case, the public traveling along the busy highways. Many tribal casinos are located on or near our busy highways. The nexus between the serving of liquor by the drink at the casinos and the traveling public compels us to reject the Tribe's claim of legal irresponsibility for serving liquor to obviously intoxicated casino patrons. Like any other state-licensed commercial vendor operating a bar and serving alcoholic beverages for consumption on the premises, the Tribe is subject to the criminal and civil jurisdiction of the state courts and may be hailed into state court to answer allegations that it furnished alcoholic beverages to a noticeably intoxicated customer.

**OPINION OF THE COURT OF CIVIL APPEALS VACATED; DISMISSAL ORDER OF THE DISTRICT COURT REVERSED AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.**

WINCHESTER, C.J., and HARGRAVE, OPALA, TAYLOR, COLBERT, and REIF, JJ., concur.

WATT, J., (by separate writing) concurs specially.

EDMONDSON, V.C.J., and KAUGER, J., (by separate writing) dissent.

WATT, J. concurring specially.

¶ 1 I express no opinion as to whether liability may ultimately lie against the Tribe under the facts presented. Nevertheless, I agree with the majority's determination that the Tribe effectively waived any right to the shield of sovereign immunity by the casino's agreement to be bound by state law. I also

recognize that, generally, the issue of tribal sovereign immunity is established by federal law. In reaching the decision today, this Court has considered federal precedent. However, once the casino waived its sovereign immunity by agreeing to be bound by Oklahoma law, state law became the measure by which the cause was to be governed. Therefore, the determination that the Tribe is subject to suit in Oklahoma courts rests squarely within Oklahoma law which provides *bona fide*, separate, adequate and independent grounds for our decision.[1]

KAUGER, J., with whom EDMONDSON, V.C.J., joins dissenting.

¶ 1 Someday, the determinative issue *will be* whether sovereign immunity bars a private civil dram shop action brought against a Tribe and its gaming enterprise by a person injured in an automobile accident after being struck by a driver who allegedly became intoxicated at the tribal casino. Answering the question at this stage in the litigation appears premature because the only evidence in the record is that the driver of the automobile which struck the plaintiff was not at the casino prior to the accident.

¶ 2 The majority ignores the holding in *Kiowa Tribe of Okla. v. Mfg. Techs.*, 523 U.S. 751, 754–55, 760, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), that there is difference between the right to demand compliance with state law and the means available to enforce it. Nevertheless, because it feels compelled to issue an advisory opinion *assuming that* the Tribe or gaming enterprise is involved in this fact scenario and that it implicitly waived sovereign immunity,[1] a less complicated anal-

1. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983).

1. Because the majority decides the matter as *if* the driver had visited the gaming enterprise, it should be noted that *if* the incident had occurred at the facility the matter could be decided on different grounds. Although no gaming compact is mentioned or provided for in the record, gaming compacts in Oklahoma are governed by provisions of the Model Tribal Gaming Compact, 3A O.S. Supp.2004 § 281. Compacts entered into with the State of Oklahoma appear to include provisions and remedies for tort claims which arise out of incidents occurring at a gaming facility. The compact would be inapplicable un-

der these facts because the accident did not occur at the gaming facility. However, had an intoxicated patron been illegally served alcohol at the facility and then got behind the wheel and hit another person exiting the building, the matter might have been governed by the compact. For future compacts, the Legislature could amend § 281 to expressly include tort claims arising out of the illegal sale of alcohol at a gaming facility regardless of where the accident takes place, and the tribe could agree to such terms and consent to suit in courts of competent jurisdiction for such torts and plaintiffs would not be left without a remedy. However, the compact

ysis of the issues is required. As a public policy matter, I oppose the possibility that a commercial vendor of any kind may be able to sell alcohol to an intoxicated driver and allow that person to drive on the highways without being subject to dram shop liability in state court. However, unless Congress or the United States Supreme Court makes a change in the current law or until the State of Oklahoma begins conditioning the granting of a liquor license to a tribe or gaming enterprise on an *express* waiver of sovereign immunity for private dram shop actions (just as parties have learned to do in private contracts), I must dissent to the majority opinion because it ignores controlling precedents.

## FACTS

¶3 On April 30, 2004, the plaintiff/appellant Shatona Bittle (Bittle) was driving westbound on State Highway 9 in Pottawatomie County, Oklahoma. The defendant/appellant Valentine Bahe (Bahe), driving a vehicle owned by his passenger Val Tsosie (Tsosie), was traveling eastbound on Highway 9 when he crossed the center line and collided with Bittle. Bahe died at the scene of the collision and Bittle suffered multiple injuries.

¶4 On December 7, 2005, Bittle sued Bahe, Tsosie, and the Absentee Shawnee Tribe, Inc., doing business as Thunderbird Entertainment Center and Thunderbird Wild West Casino (gaming enterprise/casino) for personal injuries resulting from the accident. She alleged that employees of either the Tribe and/or the gaming enterprise served an excessive amount of alcohol to Bahe in violation of state liquor laws, 37 O.S.2001

§ 501 et seq., when the employees knew or should have known that Bahe was intoxicated. The Tribe and the casino contend that: 1) neither Bahe nor Tsosie were ever at the casino prior to the accident;[2] 2) the casino closed at 2:00 a.m., but the accident occurred 5 hours later at 7:15 a.m.; and 3) open containers of alcohol were discovered in Tsosie's automobile.

¶5 On January 3, 2006, the Tribe filed a Special Entry of Appearance, a Motion to Quash Summons, and Motion to Dismiss. The Tribe argued that: 1) the Absentee Shawnee Tribe is not a corporate entity,[3] but rather a sovereign nation not subject to suit in Oklahoma State Courts absent Congressional authorization or an express waiver of sovereign immunity; 2) the gaming enterprises were not properly-named defendants; and 3) the plaintiff, on December 8, 2005, filed an identical suit in tribal court and could not proceed simultaneously in both courts. Before the trial court held a hearing, the parties agreed that the plaintiff could amend her petition, and an amended petition was filed on February 2, 2006, re-naming the Tribe and Thunderbird Entertainment Center as defendants.[4]

¶6 After a hearing on the matter, the trial court on August 1, 2006, entered an order of dismissal, finding that the case should be dismissed because the court lacked subject matter jurisdiction over the controversy. Concerning the gaming enterprise, the court determined that it had not clearly or expressly waived sovereign immunity by applying for and accepting a state license to sell and distribute alcoholic beverages in accordance

---

would be subject to the approval of the Secretary of the Interior.

2. Although Bittle insists that the Tsosie admitted to the investigating Oklahoma Highway Patrol Trooper that she and Bahe were at the Thunderbird Casino, the accident report is not in the record. Tsosie, by affidavit, states that she and Bahe were never at the casino before the accident.

3. According to the Tribe, it was a domestic not-for-profit corporation that was incorporated in July of 1973, but the corporation was dissolved in December of 18, 1974. A tribe may be incorporated under Section 17 to the Indian Reorganization Act of 1934, 25 U.S.C. § 477m, by

which the Secretary of the Interior issues the tribe a corporate charter providing separate legal entities to conduct government and business activities. It is unclear as to whether this is the corporation to which the Tribe is referring.

4. According to the Tribe, Thunderbird Entertainment Center, Inc. is a Tribal Corporation created and authorized by the Tribe. Included in the record is the Certificate of Incorporation from the Office of the Secretary of the Absentee–Shawnee Tribe of Oklahoma dated June 8, 2000. In the application for the liquor license on behalf of Thunderbird Entertainment Center, Inc., the gaming enterprise refers to itself as wholly owned by the Tribe.

with the Oklahoma Alcoholic Beverage Control Act, 37 O.S.2001 § 501 et seq.[5] Regarding the Tribe, the court determined that it did not hold an alcoholic beverage license,[6] nor did it clearly or expressly waive sovereign immunity by adopting its own alcohol regulation statutes.[7]

¶ 7 On September 7, 2006, the trial court amended the order to provide that it was a final order and that there was no just reason for delay for its immediate appeal. Bittle appealed and the Court of Civil Appeals affirmed, holding that the Tribe and the gaming enterprise were immune from suit. Bittle filed a petition for certiorari on April 11, 2007, and we granted certiorari on June 4, 2007.

¶ 8 **NEITHER CONGRESS NOR THE UNITED STATES SUPREME COURT HAS CLEARLY DETERMINED THAT THE DOCTRINE OF SOVEREIGN IMMUNITY HAS BEEN WAIVED OR IS INAPPLICABLE TO PRIVATE DRAM SHOP ACTIONS.**

¶ 9 Neither party disputes the State's ability to regulate the sale of alcoholic beverages by either a tribe or gaming enterprise. Both parties agree that *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), is dispositive of this issue, but they differ strongly on its application. The Tribe argues that: 1) a private cause of action for the illegal sale of alcohol to an already intoxicated person does not exist against a Tribe or gaming enterprise; and 2) even if it did exist,

sovereign immunity precludes state court jurisdiction over the action. Bittle contends that: 1) dram shop liability exists and is applicable to the Tribe and gaming enterprise; and 2) sovereign immunity is inapplicable altogether, but even if it were not, both the Tribe and gaming enterprise waived it.

### a. Dram Shop Liability.

¶ 10 Sovereign immunity notwithstanding, this Court has not expressly determined that a dram shop action may be maintained against a tribe or gaming enterprise. However, in *Brigance v. Velvet Dove Restaurant, Inc.*, 1986 OK 41, ¶¶ 15–17, 725 P.2d 300, we abrogated the common law rule that a tavern owner could not be held liable for furnishing alcoholic beverages to one who, after becoming intoxicated, injured either himself or another.

¶ 11 *Brigance* determined that a commercial vendor for on-the-premises consumption is under a duty, imposed both by statute [8] and common law principles, to exercise reasonable care in selling or furnishing alcoholic beverages to persons who by previous intoxication may lack full capacity or self-control to operate a motor vehicle and who, therefore, could subsequently injure a third party. The injured party may summon a commercial vendor who breaches that duty into court in a common law negligence action to recover for injury caused by breach of that duty. *Brigance*, supra at ¶ 17.

¶ 12 We have since expanded *Brigance*.[9] In *Tomlinson v. Love's Country Stores, Inc.*, 1993 OK 83, ¶ 18, 854 P.2d 910, a convenience

---

5. Although neither party disputes that the gaming enterprise did in fact hold an alcoholic beverage license from the State of Oklahoma, no such license is included in the record. However, the application for the license was included. Also included is a document from the Alcoholic Beverage Laws Enforcement Commission which refers to a license number.

6. Nothing in the record indicates that the Tribe had ever sought, obtained or otherwise held an alcoholic beverage license from the State of Oklahoma.

7. The Absentee Shawnee Tribe has enacted Alcohol Regulations found in their tribal statutes § 1–01 et seq.

8. Title 37 O.S.2001 § 237 provides in pertinent part:

    A. No person shall:
    1. Knowingly sell, deliver, or furnish alcoholic beverages to any person under twenty-one (21) years of age;
    2. Sell, deliver or knowingly furnish alcoholic beverages to an intoxicated person or to any person who has been adjudged insane or mentally deficient; . . . .

9. *But see, Ohio Casualty Ins. Co. v. Todd,* 1991 OK 54, ¶ 1, 813 P.2d 508, wherein the Court declined to extend *Brigance* to an adult who voluntarily becomes intoxicated and is injured as a result of his own inability to drive a vehicle properly.

store sold beer to three minors for consumption off premises. The driver, one of the minors, became intoxicated, lost control of his vehicle and wrecked it, killing another one of the minors. We extended *Brigance* to include off-premises consumption when the vendors sell to minors.

¶ 13 The next year in *Mansfield v. Circle K Corp.*, 1994 OK 80, ¶ 13, 877 P.2d 1130, after a minor illegally purchased beer at a convenience store, the minor got drunk and injured himself by jumping into a shallow swimming pool. The Court held that: 1) a commercial vendor is prohibited by statute from selling beer to minors; 2) the vendor's statutory duty not to sell beer to a minor is not limited to on-the-premises consumption; and 3) if the minor is injured after consuming the beer purchased from the vendor, the minor may have a cause of action against the vendor. In *Busby v. Quail Creek Golf & Country Club*, 1994 OK 63, ¶ 12, 885 P.2d 1326, we extended *Mansfield* to on-the-premises consumption when a minor was injured when she fell off a balcony at a country club party after she had been served there.

¶ 14 Finally, in *Copeland v. Tela Corp.*, 1999 OK 81, ¶ 10, 996 P.2d 931, the Court determined that a pedestrian struck by an intoxicated driver who was a customer of a bar where the customer had been drinking alcoholic beverages could bring an negligence action against the commercial vendor. Neither the Tribe nor the casino offer a persuasive reason as to why *Brigance* and its progeny would not extend to them when either is acting as a commercial vendor providing alcohol to patrons.[10] However, the question remains as to whether sovereign immunity would preclude an action from being brought in state district court.

**b. The State may regulate the sale of alcoholic beverages by either a tribe or gaming enterprise, but tribal sovereign immunity, whether asserted by a tribe or gaming enterprise, precludes a private dram shop action from being brought in state court.**

¶ 15 Pursuant to 18 U.S.C. § 1154, it is a Federal crime to dispense intoxicants on Indian lands.[11] Section 1154 provides in pertinent part:

(a) Whoever sells, gives away, disposes of, exchanges, or barters any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or other intoxicating liquor of any kind whatsoever, except for scientific, sacramental, medicinal or mechanical purposes, or any essence, extract, bitters, preparation, compound, composition, or any article whatsoever, under any name, label, or brand, which produces intoxication, to any Indian to whom an allotment of land has been made while the title to the same shall be held in trust by the Government, or to any Indian who is a ward of the Government under charge of any Indian superintendent, or to any Indian, including mixed bloods, over whom the Government, through its departments, exercises guardianship, and whoever introduces or attempts to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, shall, for the first offense, be fined under this title or imprisoned not more than one year, or both; and, for each subsequent offense, be fined under this title or imprisoned not more than five

---

10. There is no allegation that the tribe or the gaming enterprise was selling alcoholic beverages without a valid license. If one were, not only would it be subjected to civil dram shop liability, but it would be exposed to criminal penalties as well.

11. Title 18 U.S.C. § 1151 defines Indian country and provides:

Except as otherwise provided in sections 1154 and 115 of this title, the term 'Indian country', as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States

Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

years, or both.... [12]

An exception to criminal liability is found in 18 U.S.C. § 1161 which provides:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior and published in the Federal Register.

In *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961, the United States Supreme Court addressed the meaning of § 1161 and whether it allows a state to regulate and license alcohol transactions on tribal land.

¶ 16 *Rice* involved a tribal member and federally-licensed Indian trader who operated a general store on the Pala Reservation in San Diego, California. The Pala Tribe had adopted an ordinance permitting the sale of liquor on the reservation pursuant to § 1161. Rehner asked the State of California for an exemption from its license requirement to sell liquor for off-premises consumption and the State denied the request. Rehner sought an injunction in federal district court. The federal court determined that § 1161 re-

quired Rehner to have a state license and dismissed his petition.

¶ 17 The United State Supreme Court determined that 18 U.S.C. § 1161 **authorized,** rather than pre-empted state regulation of Indian liquor transactions. The Court noted that, in the area of liquor regulation, there was no traditional tribal self-governance nor was there any tradition of tribal sovereign immunity in favor of liquor regulation by Indians. The Court recognized state and federal concurrent jurisdiction over alcoholic beverages in Indian country. *Rice* also recognized that the states' authority to regulate liquor transactions on Indian lands was based solely on § 1161 without regard to the fact that California was a Public Law 280 state which already possessed general civil and criminal jurisdiction over Indian Country.[13] Consequently, under *Rice v. Rehner* there is no doubt that the State of Oklahoma, even though it is not a PL 280 state, has the authority under § 1161 to regulate and license the sale of alcoholic beverages by either a tribe or gaming enterprise.

¶ 18 Admittedly, the Supreme Court utilized broad language when discussing a state's interest in regulating and licensing liquor:

> Rehner's distribution of liquor has a significant impact beyond the limits of the Pala Reservation. The State has an unquestionable interest in the liquor traffic that occurs within it borders, and this interest

---

**12.** Title 18 U.S.C. § 1156 provides in pertinent part:

> Whoever, except for scientific, sacramental, medicinal, or mechanical purposes, possesses intoxicating liquors in the Indian country or where the introduction is prohibited by treaty or an Act of Congress, shall, for the first offense, be fined under this title or imprisoned not more than one year, or both; and, for each subsequent offense, be fined under this title or imprisoned not more than five years, or both....

**13.** Public law 83–280 (commonly referred to as Public Law 280 or PL 280) was a transfer of legal authority (jurisdiction) from the federal government to state governments. Some states, including California, were given extensive criminal and civil jurisdiction over tribal lands within the affected states. In *Rice,* the Supreme Court noted in footnote 6 that "[b]ecause we base our holding on § 1161, we do not reach the issue whether the Twenty-first Amendment permits the

State to exercise jurisdiction over liquor transactions on reservation. We also do not consider whether the State effectively has authority to regulate licensing and distribution of liquor transactions on reservations under any other statute." Consequently, Public law 280 is insignificant to § 1161's application or analysis. The 10th Circuit noted this as well in *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Oklahoma Tax Commission,* 975 F.2d 1459, 1461 (10th Cir.1992), recognizing that California, the state at issue in *Rice,* has general civil and criminal jurisdiction over Indian country whereas Oklahoma has not equivalent authority to apply or enforce its state civil or criminal laws in Indian county, but a state's authority to regulate liquor transactions is not dependent on the state's exercise of jurisdiction over Indian country. *Rice's* recognitions of states' authority to regulate liquor transactions on Indian lands was based solely on § 1161.

is independent of the authority conferred on the States by the Twenty-first Amendment. (citation omitted). Liquor sold by Rehner to other Pala tribal members or to non-members can easily find its way out of the reservation and into the hands of those whom, for whatever reason, the State does not wish to possess alcoholic beverages, or to possess them through a distribution network over which the State has no control. This particular "spillover" effect is qualitatively different from any "spillover" effects of income taxes or taxes on cigarettes. "A State's regulatory interest will be particularly substantial if the State can points to off-reservation effects that necessitate State intervention." (citation omitted.).

There can be no doubt that Congress has divested the Indians of any inherent power to regulate in this area. In the area of liquor regulation, we find no "congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development." (citation omitted). With respect to the regulation of liquor transactions, as opposed to the state income taxation involved in *McClanahan,* Indians cannot be said to "possess the usual accoutrements of tribal self-government." (citation omitted). . . . Because we find that there is no tradition of sovereign immunity that favors the Indians in this respect, and because we must consider that the activity in which Rehner seeks to engage potentially has a substantial impact beyond the reservation, we may accord little if any weight to any asserted interest in tribal sovereignty in this case. *Rice v. Rehner,* 463 U.S. 713, 724, 103 S.Ct. 3291, 3298, 77 L.Ed.2d 961.

While this language is very broad, it was written in the context of the regulation and licensing of liquor, not in the context of whether sovereign immunity could extend to a private party lawsuit against a tribe or gaming enterprise. It takes a great leap of jurisprudence to determine that *Rice v. Rehner* is dispositive of the issue of sovereign immunity as it relates to private dram shop actions.

¶ 19 I am not alone in my concern. Four appellate courts have addressed the precise issue we are faced with today and have unanimously concluded that *Rice v. Rehner* does not extend to private dram shop actions. In *Foxworthy v. Puyallup Tribe of Indians Association,* 141 Wash.App. 221, 169 P.3d 53 (2007), the Washington Court of Appeals addressed whether the state court had jurisdiction over an action brought by an injured motorist who was involved in a collision with an intoxicated driver. The driver had been served alcohol by the Emerald Queen Casino, owned and operated by the Puyallup Tribe on tribal land.

¶ 20 The injured driver sued the Tribe alleging dram shop liability. The Tribe filed a motion to dismiss, asserting lack of subject matter jurisdiction because of sovereign immunity from the private lawsuit in state court. The trial court granted the motion and the injured driver appealed. The driver argued that Congress, by enacting 18 U.S.C. § 1161, implicitly waived tribal sovereign immunity from private lawsuits arising from a tribe's sale of alcohol to an intoxicated person in violation of a state dram shop act. The *Foxworthy* Court disagreed. Citing *Kiowa Tribe of Okla. v. Manufacturing Techs.,* 523 U.S. 751, 754–55, 760, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), the court noted that a tribe's sovereign immunity extends to tribal commercial and governmental activities both on and off the tribe's reservation, and it provides a defense to suits filed against them in state and federal court. It also noted that there were only two ways to waive immunity: from a tribe's express waiver or through a Congressional statute expressly abrogating tribal immunity.

¶ 21 *Foxworthy* discussed *Rice v. Rehner* and concluded that the state could regulate alcohol under § 1161; noting, however, that central to *Rice's* holding was the long-standing lack of tribal control over alcohol which had always been subject to regulation by some nontribal governmental entity—initially the federal government, and now the states. There was, however, no analogous legislative history which would support a private dram shop action against the tribe. The *Foxworthy* Court stated:

Moreover, Foxworthy disregards *Rehner's* narrow holding, which by its own language

limits waiver of tribal sovereignty to the states' regulation of alcohol licensing and distribution. *Rehner* does not expand such waiver to private lawsuits. We conclude, therefore, that the narrow waiver of tribal sovereignty immunity in *Rehner* does not apply here to establish waiver of tribal sovereign immunity from private tort lawsuits in state court based on Dram Shop violations. *Foxworthy v. Puyallup*, supra at ¶ 25.

¶ 22 Regarding arguments that immunity was inconsistent with public policy or unfair because the plaintiff's ability to recover damages depends upon the fortuitous circumstance that the intoxicated driver was served from a tribal casino instead of a non-Indian establishment off of the reservation, the *Foxworthy* Court said:

Regardless of whether the current state of dram shop case law tolerates inequities, to date, Congress has not implemented a change or acted to abrogate tribal sovereign immunity in private dram-shop-related tort actions such as Foxworthy's. We hold, therefore, that tribal sovereign immunity remains intact and that the *Kiowa Tribe* holding supports, rather than undermines, the trial court's dismissal of Foxworthy's complaint. *Foxworthy v. Puyallup*, supra at ¶ 37.

¶ 23 Appellate Courts in Arizona and Texas have reached the same conclusion in *Filer v. Tohono O'Odham Nation Gaming*, 212 Ariz. 167, 129 P.3d 78 (App.2006), *review denied* Sept. 26, 2006, and *Holguin v. Ysleta Del Sur Pueblo*, 954 S.W.2d 843 (Tex.App.-El Paso 1997), *review denied* June 5, 1998. In *Filer*, an injured motorist sued a tribal casino that had served excessive amounts of alcohol to a motorist who then caused an accident that injured Filer and killed his wife. In affirming the trial court's dismissal of the Filers' negligence action against the tribe that owned and ran the casino, the court determined that: 1) § 1161 does not even reference tribal sovereign immunity, much less provide a waiver of such immunity for dram-shop-related litigation; and 2) *Rice v. Rehner* demanded tribal compliance with state law but it did not address a private

right of action to enforce a state law against a tribe. *Filer v. Tohono*, supra at 82–83.

¶ 24 Similarly, in *Holguin*, the victim's family brought a private dram shop action against a tribe that had served alcohol to an intoxicated driver who left the tribal casino and later collided with and killed Hoguin. The Texas Court recognized that under *Rice v. Rehner*, the tribe was subject to state alcohol licensing and permitting requirements, but noted the difference between state regulation of alcohol and a state's ability to collect monetary damages. The court held that waiver of sovereign immunity for one did not indicate a waiver for the other. Finally, the court determined that § 1161 neither created a private action under the Texas dram shop act nor waived tribal sovereign immunity for a private lawsuit based on the Texas dram shop act.

¶ 25 Finally, our own Court of Civil Appeals in this cause reached the same result as the other appellate courts. It recognized that § 1161 reflects neither a clear and express Congressional authorization of suit against a tribe for violation of state alcoholic beverage laws, nor a clear and express waiver of tribal sovereign immunity. Additionally, it determined that the Tribe's agreement by ordinance to adhere and comply with state regulations for the service and sales of alcoholic beverages on tribal land does not constitute the requisite clear and express waiver of tribal sovereign immunity for a private right of action.

¶ 26 While I realize that these appellate court opinions are not binding or precedential in our Court, I find their reasoning more persuasive than the majority opinion because they follow the traditional legal analysis of the United States Supreme Court. The Supreme Court may choose to extend *Rice*. It may determine that *Rice* allows such an action, but it will do so by following precedent within the framework of its procedure rather than by ignoring it. The long line of cases from the United States Supreme Court all stand on the fundamental foundation that for Congress to waive sovereign immunity it must be "unequivocally" express for that purpose, and for a tribe to relinquish its immunity, a tribe's waiver must be express, in writing and "clear." *C & L Enter-*

prises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.E.2d 623 (2001); Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Business has learned this lesson, sometimes painfully, that the absence of the magic words renders contracts unenforceable, while the inclusion of the magic sentence imposes legal responsibility.

¶ 27 Consequently, I would hold that Congress did not clearly and expressly abrogate tribal immunity from private, state-court, dram-shop litigation when it required tribal compliance with state liquor laws, nor has the United States Supreme Court made such a determination. Until Congress or the United States Supreme Court makes a change in the current law or until the State of Oklahoma begins conditioning the granting of a liquor license to a tribe or gaming enterprise on an *express* waiver of sovereign immunity for private dram shop actions, much like people have learned to do in private contracts, the Tribe and gaming enterprise are entitled to assert sovereign immunity.

### c. Waiver of Sovereign Immunity May Not be Implied.

¶ 28 The majority concludes that sovereign immunity is inapplicable to these proceedings. Nevertheless, it spends nine paragraphs discussing whether the Tribe has waived sovereign immunity "[i]f the Tribe has any immunity from judicial enforcement of the alcoholic beverage laws." This dicta is unnecessary, irrelevant, and limited to the narrow and limited context of alcohol regulation.

¶ 29 The majority acknowledges that waiver of sovereign immunity for a federally recognized Tribe to be sued must be unequivocal.[14] Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.[15] Thus, suits against Indian tribes are barred absent a clear waiver by the tribe or congressional abrogation.[16] A waiver of sovereign immunity cannot be implied but must be unequivocally expressed.[17]

¶ 30 In Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), the United States Supreme Court noted that an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. Kiowa involved a tribe which, through a promissory note, agreed to pay Manufacturing Technologies $285,000 plus interest. The note contained no waiver of immunity. When the tribe defaulted, Manufacturing Technologies sued in state court and the United States Supreme

14. Tribal Immunity is a matter of federal law and is not subject to diminution by the States. Hoover v. Kiowa Tribe of Oklahoma, 1999 OK 61, ¶ 5, 986 P.2d 516. Congress must 'unequivocally' express the abrogation of tribal immunity and a tribe's waiver must be 'clear.' C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001). Common-law sovereign immunity possessed by an Indian tribe is necessary corollary to Indian sovereignty and self-governance. Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 891, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986). Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe. Puyallup Tribe, Inc. v. Department of Game State of Wash., 433 U.S. 165, 172, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977).

15. C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, see note 13,

supra; Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991); Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

16. C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, see note 14, supra; Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, see note 14, supra; Santa Clara Pueblo v. Martinez, see note 14, supra.

17. C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, see note 14, supra; Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, see note 14, supra; Santa Clara Pueblo v. Martinez, see note 14, supra.

Court held that the tribe was immune from suit.

¶ 31 In *Kiowa*, the Court noted that to date, it had sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred. Nor had it drawn a distinction between governmental and commercial activities of a tribe. When asked to confine sovereign immunity to reservations or to noncommercial activities, the Court declined to draw such a distinction and deferred the role to Congress through explicit legislation. Because Congress had not abrogated immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation, and because the tribe did not waive it, immunity governed the cause.

¶ 32 The majority opinion does not discuss previous ways in which a waiver has been determined to be "express" by a tribe. Nor does it cite to any authority in which a tribe has been held to have waived immunity simply by applying for and receiving a required state license of any kind. Yet, the majority determines that because this Tribe authorized a tribal corporation to apply for an alcoholic beverage license, both the Tribe and the gaming enterprise *implicitly* waived immunity from tort liability based on an alleged violation of the regulations. This reasoning is inconsistent with *Kiowa's* determination that a waiver of immunity must be through express Congressional legislation or done expressly by a tribe.

¶ 33 Federal Courts have rejected the argument that a tribe, by agreeing to comply with federal law, could somehow have *implicitly* waived sovereign immunity. For instance, in *Dillon v. Yankton Sioux Tribe Housing Authority*, 144 F.3d 581, 584 (8th Cir.1998), the plaintiff alleged that the tribe fired him on the basis of race in violation of federal civil rights statutes. The tribe asserted sovereign immunity. The plaintiff argued that because the tribe's housing authority received federal financial assistance from the Department of Housing and Urban Development and agreed to comply with federal civil rights laws, it waived sovereign immunity. The Court rejected this argument holding that the taking of federal funds, even when accompanied by an agreement not to discriminate in violation of federal laws, does not necessarily effect a waiver of tribal sovereign immunity for suits brought under those laws.

¶ 34 The *Dillon* Court noted that there was no provision in the regulations which mandated a waiver of sovereign immunity when a tribal housing authority entered into an agreement with HUD. Because the Authority did not explicitly waive its sovereign immunity, the court lacked jurisdiction to hear the dispute.

¶ 35 The same reasoning was applied by the 11th Circuit in *Sanderlin v. Seminole Tribe of Florida*, 243 F.3d 1282, 1288 (11th Cir.2001), when it determined that even if a tribal Chief did have authority to waive immunity under tribal law, there was no evidence he did so. The Chief entered into contracts for federal financial assistance in which he promised the tribe would not discriminate in violation of federal civil rights laws. The court held this was merely a promise not to discriminate, but it in no way constituted an express and unequivocal waiver of sovereign immunity and consent to be sued in federal court. There was no voluntary waiver of immunity.

¶ 36 The same rationale seems fairly applicable to a tribe or tribal enterprise agreeing to comply with State law when it applies for and receives a liquor license without a state mandate of a waiver of sovereign immunity for private party tort claims as a condition for the license. Public policy can be protected without a tortured construction of the law. If tribes or their gaming enterprises choose to do business in the form of alcohol sales, they can sign an express waiver of immunity. There is no "express" waiver merely by a tribe's authorization of the sale of alcohol on tribal land pursuant to federal law or its gaming enterprise's agreement to comply with state law when it obtains its liquor license. Accepting the license is nothing more than a promise to comply with state liquor laws, not a voluntary waiver of sovereign immunity for private party lawsuits. The majority's conclusion is inconsistent with

the well-settled rule that a waiver of immunity must be clear and express.[18]

## CONCLUSION

¶ 37 While Congress and the United States Supreme Court have determined that a state may regulate and license alcoholic beverages on Indian land, neither has addressed the waiver of tribal sovereignty immunity from private dramshop actions in a state court. Accordingly, I must dissent until a change in the current law is made or until the State of Oklahoma begins conditioning the granting of a liquor license to a tribe or gaming enterprise on an *express* waiver of sovereign immunity for private dram shop actions much like parties have learned to do in private contracts.

**18.** The majority opinion today once again misperceives the issue of tribal sovereign immunity. This Court has had four strikeouts in five attempts to resolve issues relating to and involving tribal sovereign immunity correctly. *Hoover v. Kiowa Tribe of Oklahoma,* 1995 OK 136, 909 P.2d 59, *judgment vacated* by the United States Supreme Court, *Kiowa Tribe of Oklahoma v. Hoover,* 525 U.S. 801, 119 S.Ct. 32, 142 L.Ed.2d 25 (1998); *Aircraft Equipment Co. v. Kiowa Tribe of Oklahoma,* 1996 OK 81, 921 P.2d 359, *overruled* by *Carl E. Gungoll Exploration Joint Venture v. Kiowa Tribe of Oklahoma,* 1998 OK 128, 975 P.2d 442; *Aircraft Equipment Co. v. Kiowa Tribe of Oklahoma,* 1997 OK 59, 939 P.2d 1143, *judgment vacated* by *Kiowa Tribe of Oklahoma v. Aircraft Equipment Co.,* 524 U.S. 901, 118 S.Ct. 2058, 141 L.Ed.2d 136 (1998); *Hoover v. Kiowa Tribe of Oklahoma,* 1998 OK 23, 957 P.2d 81, *judgment vacated* by *Kiowa Tribe of Oklahoma v. Hoover,* 525 U.S. 801, 119 S.Ct. 32, 142 L.Ed.2d 25 (1998). Finally, in *Hoover v. Kiowa Tribe of Oklahoma,* 1999 OK 61, 986 P.2d 516, the Court got one right. While the make-up of the United States Supreme Court has changed and the outcome today could be different than the outcome ten years ago, any change has yet to be effectuated in the caselaw regarding tribal sovereign immunity and as Justice Summers pointed out in *Hoover,* "the Court would be wise to use restraint" until such time as the United State Supreme Court has spoken.